## CROSSMAN *v.* BURRILL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 22.   Argued March 14, 1900.—Decided November 26, 1900.

In a charter-party which contains a clause for cesser of the liability of the charterers, coupled with a clause creating a lien in favor of the ship owner, the cesser clause is to be construed, if possible, as inapplicable to a liability with which the lien is not commensurate.

By a charter-party, the charterers agreed to pay a stipulated rate of freight 'on proper delivery of the cargo at the port of destination, and to discharge the cargo at that port, at the rate of an average amount daily; and the charter-party contained these clauses: "The bills of lading to be signed as presented, without prejudice to the charter." "Vessel to have an absolute lien upon the cargo for all freight, dead freight and demurrage. Charterers' responsibility to cease when the vessel is loaded and bills of lading are signed." The bills of lading provided that the cargo should be delivered to the charterers or their assigns, "they paying freight as per charter-party, and average accustomed;" but did not mention demurrage.

*Held:* That the cesser clause did not affect the liability of the charterers to the ship owners for demurrage according to the charter-party.

A provision in a charter-party, obliging the charterers to discharge the cargo at the port of destination at the average rate of a certain amount per day, and requiring them to pay a certain sum for every day's detention "by default of" the charterers, does not make them liable for a detention caused by the actual firing of guns from an enemy's ships of war upon the forts in the harbor, rendering the discharge of the cargo dangerous and impossible.

The case is stated in the opinion.

*Mr. Everett P. Wheeler,* for Crossman, cited *Ford* v. *Cotesworth,* L. R. 4 Q. B. 127, *S. C.* 5 Q. B. 544; *Cunningham* v. *Dunn,* L. R. 3 C. P. Div. 443; *Dahl* v. *Nelson,* 6 App. Cas. 38; *Carsanego* v. *Wheeler,* 16 Fed. Rep. 248; *The Spartan,* 25 Fed. Rep. 44; *White* v. *Steamship Winchester Co.,* 23 Scottish L. R. 342; *Gates* v. *Goodloe,* 101 U. S. 612; *Geismer* v. *Lake Shore & Michigan Southern Railroad,* 102 N. Y. 563; *In re Young & Harston's Contract,* L. R. 31 Ch. Div. 168; *Caffavini* v. *Walker,* 9 Irish Rep. C. L. 431; *Baily* v. *De Crespigny,* L. R. 4 Q. B. 180;

Counsel.

*Price* v. *Hartshorn,* 44 N. Y. 94; *1600 tons Nitrate of Soda,* 15 U. S. App. 369; *Waugh* v. *Morris,* L. R. 8 Q. B. 202; *Cargo* ex *Argos,* L. R. 5 P. C. 134; *Davies* v. *McVeagh,* 4 Ex. Div. 265; *Leer* v. *Yates,* 3 Taunt. 387; *Postlethwaite* v. *Freeland,* 5 App. Cas. 599; *Grant* v. *Coverdale,* 9 App. Cas. 470; *Budgett* v. *Binnington,* L. R. 25 Q. B. D. 320; *Davis* v. *Wallace,* 3 Cliff. 123; *Clink* v. *Radford,* 1891, 1 Q. B. 625; *McLean* v. *Fleming,* 2 H. L. Sc. App. 128; *Gledstanes* v. *Allen,* (1852) 12 C. B. 202; *Insurance Co.* v. *Dutcher,* 95 U. S. 269; *Chicago* v. *Sheldon,* 9 Wall. 50; *Gen. Mut. Ins. Co.* v. *Sherwood,* 14 How. 351; *Woolsey* v. *Funke,* 121 N. Y. 87; *Reid* v. *Sprague,* 72 N. Y. 457; *Nicoll* v. *Sands,* 131 N. Y. 19; *Watteau* v. *Fenwick,* L. R. 1 Q. B. 346 (1893); *Hubbard* v. *Tenbrook,* 124 Penn. St. 291; *Cummings* v. *Sargent,* 9 Met. (Mass.) 172; *Bergenthal* v. *Fiebrantz,* 48 Wisconsin, 435; *Minor* v. *Mechanics' Bank,* 1 Pet. 46; *Bridenbecker* v. *Lowell,* 32 Barb. 9; *New Orleans Railroad Co.* v. *Hanning,* 15 Wall. 649; *Baltimore Trust & Guarantee Co.* v. *Hambleton,* 40 L. R. Ann. 216; *The Edward H. Blake,* 63 U. S. App. 507; *Alexander* v. *Dowie,* 1 Hurlst. & N. 152; *Leather Manufacturers' Bank* v. *Morgan,* 117 U. S. 96; *Penn. Mutual Life Ins. Co.* v. *Austin,* 168 U. S. 685; *Palmerton* v. *Huxford,* 4 Denio, 166; *Nassoiy* v. *Tomlinson,* 148 N. Y. 326; *Boffinger* v. *Tuyes,* 120 U. S. 198; *United States* v. *Child,* 12 Wall. 232; *Fuller* v. *Kemp,* 138 N. Y. 231; *Laycock* v. *Pickles,* 4 B. & S. 497; *Wilson* v. *Frisbie,* 57 Georgia, 269; *Quinlan* v. *Keiser,* 66 Missouri, 603; *Linville* v. *State,* 130 Indiana, 210.

*Mr. Lawrence Kneeland,* for Burrill, cited *Hanson* v. *Harrold,* 1 Q. B. (1894) 612; *In re bags of Linseed,* 1 Black, 108; *The H. G. Johnson,* 48 Fed. Rep. 696; *Chappel* v. *Comfort,* 10 C. B. N. S. 810; *Smith* v. *Sieveking,* 5 E. & B. 589; *Fry* v. *Bank of India,* L. R. 1 C. P. 689; *Gray* v. *Carr,* L. R. 6 Q. B. 522; *Dayton* v. *Parke,* 142 N. Y. 391; *Porteus* v. *Watney,* L. R. 3 Q. B. D. 534; *Clink* v. *Radford,* (1891) 1 Q. B. 625; *Brankelow S. S. Co.* v. *Canton Ins. Co.,* 2 Q. B. (1899) 178; *Ogden* v. *Graham,* 1 Best & Smith, 773; *Sleeper* v. *Puig,* 17 Blatchford, 36; *Sixteen hundred tons of Nitrate of Soda*

v. *McLeod*, 61 Fed. Rep. 849 ; *Booge* v. *Cargo of Dry Boards*, 42 Fed. Rep. 335 ; *Budgett* v. *Binnington*, 25 Q. B. D. 320 ; *Hall* v. *Eastwick*, 1 Lowell, 456 ; *Postlethwaite* v. *Freeland*, 5 App. Cas. 599 ; *Davis* v. *Wallace*, 3 Clifford, 123 ; *Cargo* ex *Argos*, L. R. 5 P. C. 134 ; *Thiis* v. *Byers*, 1 Q. B. D. 244 ; *Davies* v. *Mc-Veagh*, 4 Ex. Div. 265 ; *Leer* v. *Yates*, 3 Taunt. 387; *Barker* v. *Hodgson*, 3 Maule & Sel. 267; *Barret* v. *Dutton*, 4 Camp. 333 ; *Grant* v. *Coverdale*, 9 App. Cases, 470 ; *Perkins* v. *Hart*, 11 Wheat. 237; *Harden* v. *Gordon*, 2 Mason, 541.

Mr. Justice Gray delivered the opinion of the court.

This case comes up by writ of certiorari issued by this court to review a decree in admiralty of the Circuit Court of Appeals for the Second Circuit, which reversed a decree of the District Court of the United States for the Southern District of New York ; and appears by the record to have been in substance as follows :

A libel in admiralty *in personam* was filed in the District Court of the United States for the Southern District of New York by the owners of the bark Kate Burrill against her charterers to recover fifty-three days' demurrage for her detention at Rio Janeiro in Brazil, in unloading a cargo of lumber shipped for that port from Pensacola in Florida, under a charter-party dated March 7, 1893, by which the charterers were to pay a stipulated rate of freight on proper delivery of the cargo at the port of discharge, and which contained these other provisions :

" Cargo to be furnished at port of loading at the average rate of not less than twenty thousand superficial feet per running day, Sundays excepted ; and to be discharged at port of destination at the average rate of not less than twenty thousand superficial feet per running day, Sundays excepted.

" Lay days to commence from the time the vessel is ready to receive or discharge cargo, and written notice thereof is given to the party of the second part, or agent ; and for each and every day's detention by default of the said party of the second part, or agent, fifty-nine $\frac{46}{100}$ dollars United States gold (or its equivalent) per day, day by day, shall be paid by the said party of the

second part, or agent, to the said party of the first part, or agent.

"The cargo to be received at the port of loading within reach of ship's tackles, and to be delivered at port of discharge according to the custom of said port. Vessel to discharge at safe anchorage ground in Rio Bay designated by charterers.

"The bills of lading to be signed as presented, without prejudice to this charter. Any difference in freight to be settled before the vessel's departure from port of loading. If in vessel's favor, in cash, less insurance. If in charterers' favor, by captain's draft upon his consignees, payable ten days after arrival of vessel at port of discharge. Vessel to have an absolute lien upon the cargo for all freight, dead freight, and demurrage. Charterers' responsibility to cease when the vessel is loaded and bills of lading are signed."

The libel alleged, in the fourth article, that the vessel was loaded with the cargo of lumber at Pensacola, and sailed thence for Rio Janeiro, where she arrived about August 30, 1893; and, in the fifth article, "that on September 4, 1893, notice in writing that the vessel was ready to discharge her said cargo was duly given by the master of said vessel or her duly authorized agents to the Companhia Industrial do Brazil, the agent of the respondents at said port of Rio, who received the said cargo;" but that the vessel did not complete the discharge until November 28, 1893, being a period of fifty-three days beyond the twenty-six days, Sundays exclusive, allowed for the discharge by the charter.

The libel was allowed to be amended in the Circuit Court of Appeals, by alleging "that at the time of giving the notice of her readiness to discharge her cargo, mentioned in the fifth article, the said vessel was in fact ready to discharge upon the charterers designating a safe anchorage for that purpose;" by setting forth more particularly the times of the delay and suspension of the discharge of the cargo, and by alleging that during all those times the vessel was ready and willing to discharge the same; and by further alleging that there had been no payment or accord and satisfaction of the claim for demurrage.

Among the defences set up in the District Court, and more fully, but with no substantial difference, in an amended answer filed by leave in the Circuit Court of Appeals, and to the sufficiency of each of which defences the libellant filed exceptions in either court, were those which are here numbered, for convenience, as the exceptions were numbered in the Circuit Court of Appeals, and which were stated in the amended answer as follows:

Second. "That the charter-party referred to in the libel contained a clause providing that the vessel should have an absolute lien upon the cargo for freight and demurrage, and that the charterers' responsibility should cease upon the loading of the cargo and signing of the bills of lading; that said vessel was fully laden, as alleged in the fourth article of the libel, and that thereafter, and long prior to September 4, 1893, (the date upon which it is alleged in the fifth article of said libel that notice in writing was given to the agents of the respondents at Rio Janeiro that said vessel was ready to discharge her cargo,) bills of lading of similar tenor for the whole of said cargo were duly signed by the master of said vessel, a copy of which is annexed hereto, and made part hereof; and said bills of lading were duly assigned and delivered to the Companhia Industrial do Brazil, and by them assigned and delivered to Messrs. Manoel da Cruz & Filho, who thereby became the consignees of said cargo; and that thereupon all liability of these respondents to the owners of said vessel under said charter-party ceased, and it became the duty of the master and owner of said vessel, upon the failure, alleged in the fifth article of said libel, of the consignee of said cargo to discharge the same at the agreed rate per day, to notify said consignee of the amount of the demurrage claimed by reason of. said failure, and to hold said cargo until the same should have been paid, in accordance with the terms of said charter-party." The bills of lading (as appears by the copy annexed to the answer) state that the lumber had been shipped by the respondents, and was to be delivered "unto order or to their assigns, they paying freight for the said lumber as per charter-party dated March 7, 1893, and average accustomed.

Third. "That when said vessel arrived at Rio Janeiro, the

owners of said cargo used all reasonable diligence in and about receiving the cargo shipped upon the said vessel, and removing the same therefrom; that the libellants were prevented from discharging the same, and the respondents were prevented from receiving the same, any sooner than they did, by reason of the acts of the public enemy, to wit, certain vessels of war which were then in the harbor of Rio Janeiro, and were engaged in firing upon the forts in said harbor, and making war upon the government of Brazil, and that the firing between said vessels of war and the said forts made it impossible to discharge the said cargo or to receive it from the said vessel, any sooner than it was discharged or received; that the said cargo was delivered according to the custom of said port of Rio Janeiro, and that the detention alleged in the libel, if any such there be, was caused by said acts of the public enemy, and not by any default of the respondents; that the captain of the said vessel and Messrs. Phipps Brothers & Co., the agents of the libellants, acquiesced in the said delay, and recognized the necessity therefor.

Fourth. "That when the said cargo was delivered, the said agents of the libellants accepted and received from the said consignee, the sum of five hundred and fifteen pounds, six shillings and five pence, British sterling, in full satisfaction and payment of all claim or demand under the said charter-party, and an account was made and stated between the said agents of the libellants and the said consignees respecting all claims under the charter-party aforesaid, and the balance due upon the said accounting was paid by the said consignee to the said agents, and accepted and received by them in full satisfaction thereof."

The District Court, understanding the facts stated in the answer to have been admitted, sustained the second exception, overruled the third and fourth exceptions, denied a motion to withdraw these exceptions and to amend the libel, and dismissed the libel. 65 Fed. Rep. 104.

The libellants appealed to the Circuit Court of Appeals, which, after allowing amendments of the libel and answer, sustained the second and third exceptions, and overruled the fourth exception, and authorized proofs to be taken upon the defence of

payment and accord and satisfaction; and afterwards, being satisfied upon proofs so taken that there had been no payment or accord and satisfaction of the claim for demurrage, entered a decree for the libellants.    35 U. S. App. 608; 62 U. S. App. 368.

The respondents thereupon applied for and obtained a writ of certiorari from this court.

The libellants' claim for demurrage is based on the provisions of the charter-party by which, after the vessel is ready to discharge her cargo of lumber at the port of destination, and written notice thereof given to the charterers, they agree to discharge the lumber " at the average rate of not less than twenty thousand superficial feet per running day, Sundays excepted," and to pay a certain sum, by way of demurrage, " for each and every day's detention by default of " the charterers or their agents.

The charter-party further requires " the bills of lading to be signed as presented, without prejudice to this charter," and contains these clauses : " Vessel to have an absolute lien upon the cargo for all freight, dead freight and demurrage.    Charterers' responsibility to cease when vessel is loaded and bills of lading are signed."

After the vessel had been loaded, bills of lading were duly signed by the master, by the terms of which the cargo was to be delivered to the charterers or their assigns, " they paying freight as per charter-party," " and average accustomed " — referring to the charter by its date, but not mentioning demurrage.

The first question to be considered is how far the claim of the ship owners against the charterers for demurrage is affected by what is commonly called the cesser clause in the charter-party, " Charterers' responsibility to cease when vessel is loaded and bills of lading are signed."

The Circuit Court of Appeals, approving and adopting in this particular the opinion of the District Judge, held that the cesser clause afforded no defence to the libel ; and we have no doubt of the correctness of that conclusion.

The charter-party, like many mercantile instruments in com-

mon use, is drawn up in brief and disjointed sentences; and must be construed according to the intent of the parties as manifested by the whole instrument, rather than by the literal meaning of any particular clause, taken by itself.

The question here is how the clause providing that the charterers' responsibility shall cease when the vessel is loaded and bills of lading are signed is to be reconciled with the other provisions of the charter, which not only require the charterers to pay freight on delivery of the cargo, and demurrage for any delay in such delivery by fault of the charterers or their agent, but declare that the vessel is to have an absolute lien upon the cargo for both freight and demurrage.

The true rule of construction of the cesser clause, in such a connection, has been settled by a series of English decisions in which that excellent commercial lawyer, Lord Esher, lately Master of the Rolls, took a leading part; and is well summed up, with the reasons supporting it, by himself and other judges, in two recent cases in the Court of Appeal. *Clink* v. *Radford*, (1891) 1 Q. B. 625; *Hansen* v. *Harrold*, (1894) 1 Q. B. 612.

In *Clink* v. *Radford*, Lord Esher said : " In my opinion, the main rule to be derived from the cases as to the interpretation of the cesser clause in a charter-party is that the court will construe it as inapplicable to the particular breach complained of, if by construing it otherwise the shipowner would be left unprotected in respect of that particular breach, unless the cesser clause is expressed in terms that prohibit such a conclusion. In other words, it cannot be assumed that the shipowner, without any mercantile reason, would give up by the cesser clause rights which he had stipulated for in another part of the contract." Lord Justice Bowen said : " There is no doubt that the parties may, if they choose, so frame the clause as to emancipate the charterer from any specified liability without providing for any terms of compensation to the shipowner; but such a contract would not be one we should expect to see in a commercial transaction. The cesser clauses, as they generally come before the courts, are clauses which couple or link the provisions for the cesser of the charterer's liability with a corresponding creation of a lien. There is a principle of reason

which is obvious to commercial minds, and which should be borne in mind in considering a cesser clause so framed, namely, that reasonable persons would regard the lien given as an equivalent for the release of responsibility, which the cesser clause in its earlier part creates, and one would expect to find the lien commensurate with the release of liability." And Lord Justice Fry added: "The rule that we are *prima facie* to apply to the construction of a cesser clause followed by a lien clause appears to me to be well ascertained. That rule seems a most rational one, and it is simply this, that the two are to be read, if possible, as co-extensive. If that were not so, we should have this extraordinary result: there would be a clause in the charter-party the breach of which would create a legal liability, there would then be a cesser clause destroying that liability, and there would then come a lien clause which did not recreate that liability in anybody else." (1891) 1 Q. B. 627, 629, 632.

In *Hansen* v. *Harrold*, Lord Esher said that he thought that *Clink* v. *Radford* "was a right decision based upon sound mercantile reasons;" and, after quoting the passages above cited from the opinions in that case, added: "It seems to me that this reasoning has not been and cannot be answered. Therefore the proposition is true, that where the provision for cesser of liability is accompanied by the stipulation as to lien, then the cesser of liability is not to apply in so far as the lien, which by the charter-party the charterers are able to create, is not equivalent to the liability of the charterers. Where, in such a case, the provisions of the charter-party enable the charterers to make such terms with the shippers that the lien which is created is not commensurate with the liability of the charterers under the charter-party, then the cesser clause will only apply so far as the lien which can be exercised by the shipowner is commensurate with such liability." (1894) 1 Q. B. 617, 618.

In short, in a charter-party which contains a clause for cesser of the liability of the charterers, coupled with a clause creating a lien in favor of the shipowner, the cesser clause is to be construed, if possible, as inapplicable to a liability with which the lien is not commensurate.

In the case at bar, the provision of the charter-party, which

requires "the bills of lading to be signed as presented, without prejudice to this charter," while it obliges the master to sign bills of lading upon request of the charterers, does not mean that the bills of lading, or the consignee holding them, shall be subject to all the provisions of the charter; but only that the obligations of the charterers to the ship and her owners are not to be affected by the bill of lading so signed. *Gledstanes* v. *Allen*, (1852) 12 C. B. 202. The bills of lading, as already mentioned, provide only for "paying freight for said lumber as per charter-party dated 7th March, 1893, and average accustomed." They do not mention demurrage, or refer to any provisions of the charter, other than those concerning freight and average. It is well settled that a bills of lading in such a form does not subject an indorsee thereof, who receives the goods under it, to any of those other provisions of the charter. It does not give him notice of, or render him liable to, the specific provisions of the charter, which require a discharge of a certain quantity of lumber per day, or, in default thereof, the payment of a specific sum for a longer detention of the vessel; but he is entitled to take the goods within a reasonable time after arrival, and is liable to pay damages for undue delay in taking them, according to the ordinary rules of law which govern in the absence of specific agreement. *Chappel* v. *Comfort*, (1861) 10 C. B. (N. S.) 801; *Gray* v. *Carr*, (1871) L. R. 6 Q. B. 522; *Porteus* v. *Watney*, (1878) 3 Q. B. D. 534, 537; *Serraino* v. *Campbell*, (1891) 1 Q. B. 283; *Dayton* v. *Parke*, (1894) 142 N. Y. 391.

In *McLean* v. *Fleming*, (1871) L. R. 2 H. L. Sc. 128, on which the charterers relied at the argument in this court, the sole ground on which the indorsees of the bills of lading were held to be bound by the provisions of the charter-party was that they were the persons who had originally authorized the chartering of the ship. See L. R. 2 H. L. Sc. 133, 134, 136; *S. C.* L. R. 6 Q. B. 559, 560. No such fact was pleaded in the case at bar.

The only facts stated in the answer upon this point are that, after the vessel was fully laden, and long before the notice to the charterers that she was ready to discharge, bills of lading, acknowledging that the lumber had been shipped by the re-

spondents, and was to be delivered to their order or assigns, "they paying freight for the said lumber as per charter-party," were signed by the master of the vessel, and "were duly as-signed and delivered to the Companhia Industrial do Brazil, and by them assigned and delivered to" the partnership of da Cruz and Filho, "who thereby became consignees of the cargo."

Upon this state of facts, the rights of the ship owners against those consignees depended altogether on the contract created by the bills of lading, except so far as that contract referred to the charter-party. *Bags of Linseed*, (1861) 1 Black, 108. As observed by Mr. Justice Peckham, when delivering a judgment of the Court of Appeals of the State of New York, in regard to a bill of lading containing a clause exactly like that in the bills of lading in the case at bar, "It would be a wide stretch to hold that by this language of the bill of lading, which plainly re-ferred only to the provisions of the charter-party as to the freight money, a consignee would become liable to demurrage if he ac-cepted the cargo under such a bill." *Dayton* v. *Parke*, 142 N. Y. 391, 400.

The necessary consequence is that the responsibility of the charterers to the ship owners for demurrage according to the charter-party is not affected by the cesser clause.

The other principal question is of the validity of the defence that the delay in discharging the cargo was caused by the acts of the public enemy, and not by any default of the charterers.

Upon this question, the courts below differed in opinion, the District Court holding that the defence pleaded was a good one, and the Circuit Court of Appeals holding that it was not.

This defence, as set up in the amended answer filed in the Circuit Court of Appeals, is that, when the vessel arrived at Rio Janeiro, the owners of the cargo used all reasonable dili-gence in and about receiving and removing it; that the ship owners were prevented from discharging the cargo, and the respondents were prevented from receiving it, any sooner than they did, "by reason of the acts of the public enemy, to wit, certain vessels of war which were then in the harbor of Rio Ja-neiro, and were engaged in firing upon the forts in said harbor, and making war upon the government of Brazil, and that the

firing between said vessels of war and the said forts made it impossible to discharge the said cargo or to receive it from the said vessel, any sooner than it was discharged or received; that the said cargo was delivered according to the custom of said port of Rio Janeiro, and that the detention alleged in the libel, if any such there be, was caused by said acts of the public enemy and not by any default of the respondents."

We are of opinion that, under a charter-party expressed in such terms, the defence of *vis major*, as thus pleaded, affords a complete answer to the claim for demurrage.

It is to be remembered that by the terms of this charter-party it is only for " detention by default of " the charterers or their agent, that they agree to pay the amount of demurrage specified in the charter.

A detention which is caused, not by any act of the ship owners or of the charterers, but wholly by the actual firing of guns from an enemy's ships of war upon the forts in the harbor, directly affecting the vessel and making the discharge of the cargo dangerous and impossible, cannot be considered as caused by " default " of the charterers, in any just sense of the word.

In *Towle* v. *Kettell*, (1849) 5 Cush. 18, the Supreme Judicial Court of Massachusetts, in an opinion delivered by Mr. Justice Fletcher, with the concurrence of Chief Justice Shaw and Justices Wilde and Dewey, held that, under a similar provision in a charter-party, the charterers were not liable for demurrage while the vessel was detained in quarantine by order of a foreign government.

The Circuit Court of Appeals, in support of the opposite conclusion, quoted from an opinion delivered by Mr. Justice Clifford, in the Circuit Court of the United States for the District of Massachusetts, the following passage : " The settled rule is that, where the contract of affreightment expressly stipulates that a given number of days shall be allowed for the discharge of the cargo, such a limitation is an express stipulation that the vessel shall in no event be detained longer for that purpose, and that if so detained it shall be considered as the delay of the freighter, even where it was not occasioned by his fault, but was inevitable. Where the contract is that the ship shall be

unladen within a certain number of days, it is no defence to an action for demurrage that the overdelay was occasioned by the crowded state of the docks, or by port regulations or government restraints." *Davis* v. *Wallace*, (1868) 3 Clifford, 123, 131. But in none of the authorities cited, either by the learned justice in that case, or by the Circuit Court of Appeals in this, in support of this general statement, was the liability of the charterers for demurrage restricted to the case of their default. In *Davis* v. *Wallace*, indeed, their liability was so restricted; but the defence was a crowded state of the docks, and no question of port regulations or government restraints was before the court.

In *Thatcher* v. *Boston Gas Light Co.*, (1875) 2 Lowell, 361, 363, Judge Lowell, while following that decision in a similar case, said that the decisions in *Towle* v. *Kettell*, and in *Davis* v. *Wallace* "are not inconsistent with each other; and they mean that the proviso intends to exonerate the charterer from delay occasioned by superior force acting directly upon the discharge of that cargo, and not from the indirect action of such force, which by its operation upon other vessels has caused a crowded state of the docks." And he distinctly recognized that a failure of contract on the part of the charterer, "caused by a direct and immediate *vis major*, or something like it," would not be a "default," within the meaning of the charter-party.

In *Davis* v. *Pendergast*, (1879) 16 Blatchford, 565, 567, Chief Justice Waite, speaking of a similar provision, said : " The respondents, in effect, agreed that no more than forty-five running days should be occupied in loading and discharging the cargo, unless it was occasioned by some fault of the vessel, or some unusual and extraordinary interruption that could not have been anticipated when the contract was made."

The case of *Nitrate of Soda*, (1894) 15 U. S. App. 369, in the Circuit Court of Appeals for the Ninth Circuit, upon which these libellants much rely, falls far short of supporting their claim. In that case, the clause in question was in the same words as in this case ; the charterers sent the vessel, for the purpose of loading a cargo of nitrate of soda which they had purchased, to a port in Chili, during the existence of a civil war

there, and while the port was in the possession of the insurgents; the sellers declined for a time to deliver the cargo, because they feared that if the export duty, which by the law of Chili was payable upon all such cargoes, was paid by them to the insurgents, they might remain liable for it to the rightful government. It was held that the charterers were liable for the stipulated demurrage during the delay so occasioned. The court, speaking of the word "default" in the charter, said: " The most that can be claimed for its effect is that it excludes liability of the charterers for delay in loading or discharging, if the delay result from a sudden or unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers." "But there was no interference upon the part of the Chilian government, or upon the part of any armed force, to prevent their obtaining possession of the cargo, or handling or moving the same, or placing it within reach of the vessel's tackle." 15 U. S. App. 374, 376.

In the case at bar, the defence of *vis major*, as pleaded in the answer, was that the ship owners were prevented from discharging the cargo, and the charterers were prevented from receiving it, any sooner than they did, by reason of acts of the public enemy, to wit, certain vessels of war, then in the harbor of Rio Janeiro, were engaged in firing upon the forts in the harbor and in making war upon the government of Brazil; that the firing between those vessels and those forts made it impossible to discharge or to receive the cargo from the vessel any sooner than it was discharged or received; and that the detention alleged in the libel was caused by those acts of the public enemy, and not by any default of the charterers.

The *vis major*, so pleaded, was, in the words of opinions above cited, a " superior force, acting directly upon the discharge of the cargo;" "a direct and immediate *vis major*;" an "unusual and extraordinary interruption that could not have been anticipated when the contract was made;" " a sudden and unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault

of the charterers," and an "interference on the part of an armed force, preventing the handling or moving of the cargo."

Upon principle, and according to the general current of authority, the detention alleged was not caused by default of the charterers, and did not render them responsible for demurrage, under this charter-party.

The Circuit Court of Appeals therefore erred in sustaining the exception, in the nature of a demurrer, to that article of the answer which set up the defence of *vis major;* and for this reason its decree for the libellants must be reversed. The decree of the District Court, which dismissed the libel, must also be reversed, and the case remanded to the District Court, in order that both parties may have an opportunity to introduce proofs upon the issue presented by that article.

In the brief of the libellants in this court, it is suggested that the allegations of that article of the answer were not in fact true; and reference is made to the master's deposition, taken after the delivery of the principal opinion in the Circuit Court of Appeals, in which he testified that during all the time that the vessel lay at the wharf, and until the completion of the discharge, there was no firing in the harbor or other act of hostilities, which prevented her discharge of the cargo or its reception by the consignees.

But on the same page of the brief it is admitted that "this question having been heard on the exception to the sufficiency of the defence, the question as to the truth of the allegations of the answer was not before the court." And this is conclusively established by its opinions and decrees. The principal opinion shows that it took up, in the first instance, the questions of law raised by the exceptions to the answer, because their determination might relieve the parties from the delay and expense of introducing proof. 35 U. S. App. 620. By the decree thereupon made, and set out in the record, the third exception, as well as the second, was sustained, upon the ground that the article of the answer to which it related was "insufficient in the law to constitute a defence;" and the fourth exception was overruled. In short, the defences of the cesser clause and of *vis major* were both held to be insufficient as matter of

law, so that no evidence in support of either of them was competent, and no evidence to contradict either was necessary or material.

The only questions of fact, left open for the introduction of proofs, were those of payment and of accord and satisfaction, presented by the remaining article of the answer. That the Circuit Court of Appeals ·understood such to be the condition of the case is apparent from its supplemental opinion, after proofs had been taken, in which it observed that "most of the questions arising upon this appeal have been disposed of by this court upon a former occasion, and it remains to be considered whether the defences of payment and accord and satisfaction are sustained by the proofs;" and then proceeded, upon an examination of the proofs, to hold that those defences were not sustained as to the claim for demurrage, and to enter a decree for the libellants in accordance with its former opinion. 62 U. S. App. 368.

The questions of payment, and of accord and satisfaction, need no extended notice. They are pure questions of fact, depending on conflicting evidence and on the peculiar circumstances of the case; upon which, had they been the only questions presented by the record, a writ of certiorari would not have been granted; which appear to this court, upon examination of the proofs, to have been rightfully decided by the Circuit Court of Appeals; and which it would serve no useful purpose to discuss.

But for the reasons above stated, in considering the effect of the defence of *vis major*,

> *The decrees of the Circuit Court of Appeals and of the District Court are reversed, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this court.*

MR. JUSTICE MCKENNA was not present at the argument and took no part in the decision of this case.