## UNIQUE SHIPPING CO. v. J. M. GUFFEY PETROLEUM CO.

(District Court, S. D. New York.    May 7, 1909.)

SHIPPING (§§ 141, 153, 179*)—DELAY—LIABILITY—ACTS OF GOD.

The conclusion that such speed as was due from the respondent's steamer Ligonier was not attained on a voyage, which was a subject of dispute because of the use of one tug instead of two, sustained. The conclusion that the respondent was not entitled to recover for the detention of the steamer near Port Arthur because she did not go to the Sea Buoy to proceed with the towing, there having been a storm which constituted a vis major, sustained. Also held that in view of a general provision in the contract, viz., the acts of God, etc., special words of exemption from liability for the effects of a storm were not needed.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. §§ 141, 153, 179.*]

(Syllabus by the Judge.)

Wheeler, Cortis & Haight, for libellant.
Wing, Putnam & Burlingham, for respondent.

ADAMS, District Judge. This action was brought by the Unique Shipping Company, the chartered owner of the schooner W. L. Douglas, to recover the balance of certain freight on an oil cargo in bulk carried by the schooner on two voyages in October and November, 1906, from Port Arthur, Texas, to New York and Philadelphia. On the first, it was claimed that $2,051.04 remained due and on the second, $2,864.56. A further claim was made because the respondent's steamer Ligonier refused to tow the schooner to the mouth

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the Schuylkill River in conformity with a contract and dropped her near the Delaware Breakwater, from which point she was towed by tugs of less power than the Ligonier whereby the schooner was delayed 33 hours for which the libellant became entitled to compensation at the rate of $12.50 per hour, amounting to $412.50. A further claim was made for the loss of a steel hawser belonging to the schooner amounting to $500. The total claims made in the libel amounted to $5,828.10.

The answer, after some admissions and denials, alleged as follows:

"Eighth. Further answering, this respondent avers that * * * on said voyage No. 4 and in the beginning of voyage No. 5 the steamer of the respondent was delayed and detained in all for 120 hours by fault of libellant, for which, under the towing agreement (Schedule B of the libel) the Unique Shipping Company became liable to pay at the rate of twenty dollars per hour.

The items that thus became payable to the respondent, with the credit of the libellant, are set forth in detail in Exhibit 1, hereto annexed, which is made a part hereof. By reason of these items, and respondent's payment of $6,000 on account, as set forth in said statement, there became due respondent from libellant on account of said fourth voyage a balance of $1,156.80 which remained due at the commencement of the fifth voyage and for which no payment has been made or credit given by libellant.

Ninth. Further answering, this respondent alleges that pursuant to the terms of the shipping contract and the towing agreement, Schedules A and B of the libel respectively, certain items became due from libellant for shortages, demurrage and lighterage under and pursuant to the terms of said contract and agreement. These items are set forth in detail in Exhibit 2, hereto annexed, which is made a part hereof. By reason of these items, including the balance of $1,156.80 due as above alleged in article eighth thereof, there remained due and owing to libellant at the end of said fifth voyage the sum of $5,160.54 which was paid by respondent to libellant, December 5th, 1906, and on March 27th, 1907, as set forth in said Exhibit 2, and upon said payments no sum whatever remained due and owing from respondent to libellant."

Annexed to the answer were the following statements of account, alluded to therein:

"Exhibit 1.

J. M. Guffey Petroleum Company, in account with Unique Shipping Company.

Schr. 'Wm. L. Douglas,' Voyage No. 4.

| | | | |
|---|---|---|---|
| Freight on 39,091.38 bbls. at 35¢ | | $13,681.98 | |
| ½ bill of Meyer & Co. for inspection | | 22.50 | |
| | | | $13,704.48 |
| Towing | | 5,000.00 | |
| Shortage ...................873.03 bbls. | | | |
| Less 5% of 39,964.41 bbls. Gross | | | |
| Intake ...................199.82 " | | | |
| 673.21 " at $1.20 | | 807.84 | |
| Demurrage, 1 120 hrs. at $20.00 | | 2,400.00 | |
| Lighterage 13,053.72 bbls. at 5% | | 652.69 | |
| Cartage paid Sept. 22, 1906, per bill rendered | | .75 | |
| | | | 8,861.28 |
| | | | 4,843.20 |
| Paid on account | | | 6,000.00 |
| Balance due J. M. G. P. Co. | | | $ 1,156.80 |

1 49 hrs. of the 120 hrs. Demurrage were at the beginning of Voyage No. 5.

Exhibit 2.

J. M. Guffey Petroleum Company, in account with Unique Shipping Company.

Schooner 'Wm. L. Douglas,' Voyage No. 5.

Dr.

| | | |
|---|---|---|
| Freight on 39,344.30 bbls. oil at 35¢ | $13,770.50 | |
| ½ bill of Meyer & Co. for inspection | 22.50 | |
| | | $13,793.00 |

Credits.

| | | | |
|---|---|---|---|
| Towing | | | $ 5,000.00 |
| Shortage | 204.21 bbls. | | |
| Less 5% of gross intake (39,546.51 bbls.) | 197.74 " | | |
| | 6.47 " at $1.20 | | 7.76 |
| Demurrage | 109 hours | | |
| Less free time | 24 " | | |
| | 85 " at $20.00 | | 1,700.00 |
| Lighterage 13,828 bbls. at 5¢ | | | 691.40 |
| Amount paid Red Star Tugs for towage of Schooner from Anchorage to Gibson's Point, per their bill Dec. 5th | | | 60.00 |
| Bills rendered by Gulf Refining Co.: | | | |
| 1 Telephone call Bayonne to Philadelphia | | | .75 |
| Oil furnished at Port Arthur | | | 15.75 |
| Balance due J. M. Guffey Petroleum Co. on a/c Voyage No. 4, per statement dated 3/27/07 | | | 1,156.80 |
| Amount paid on account Dec. 6th | | | 5,000.00 |
| " " " " Mar. 27th | | | 160.54 |
| | | $13,793.00 | $13,793.00" |

By consent of the parties, the matter was referred to a commissioner, who subsequently reported, in part, as follows:

"On the first claim of the libellant, viz.: freight for the voyage of the Schooner 'W. L. Douglas,' October 12–November 1, 1906, less shortage, there is due to libellant......................... $1,243.20
With interest from November 1, 1906, to January 16, 1909...... 156.98
On the second claim of the libellant, viz.:
freight on voyage of the Schooner 'W. L. Douglas,' November 13–December 4, 1906, there is due to libellant............... 2,856.80
With interest from December 4 (?), 1906, to January 16, 1909..... 362.75
On the third and fourth claims of the libellant, viz.:
14¾ hours detention on voyage 4.
18¼ " " " " 5.
of the schooner 'W. L. Douglas,' there is due to libellant...... 56.25
With interest from December 2, 1906, to January 16, 1909........ 7.14
On the fourth claim of the libellant, viz.: loss of hawser, there is due to libellant, nothing.

$4,683.12

On the first set-off of the respondent, viz.: detention of the S. S. 'Ligonier' at Sabine Pass, October 13–16, 1906, 71 hours, there is due the respondent nothing.
On the second set-off of the respondent, viz.: detention of the S. S. 'Ligonier' at Philadelphia, October 30–November 1, 1906, 49 hours, there is due to respondent nothing.
On the third set-off of the respondent, viz.: detention of the S. S. 'Ligonier' at Sabine Pass, November 16–21, 1906, 109 hours, there is due to respondent nothing.

There is therefore, due the libellant the sum of................. $4,683.12"

The respondent filed numerous exceptions to the report, which it summarizes as follows:

"1st. The finding and allowance of $56.25 for undue delay in towing the Douglas on December 1st and 2d, 1906.

2d. The ruling that the towing steamers' demurrage under this contract would not begin until the Ligonier actually came out to the sea-buoy, some four miles of the entrance to Port Arthur.

3d. The ruling that the term 'fault' in the contract provision for detaining the steamship required actual evidence of wrong and neglect instead of interpreting same according to the received principles in demurrage contracts."

These exceptions will now be considered.

1. The commissioner disallowed a claim made for tardy towing where two tugs were employed instead of the Ligonier, but held where only one was doing the towing as follows: He said:

"Fourth.

On the next voyage only one tug, instead of two, was substituted for the Ligonier. She dropped the Douglas at 10 A. M. on December 1, and she reached League Island at 5:35 P. M. on the same day. The Douglas did not reach League Island till 3:15 P. M. on December 2 (Minford, p. 190–1), twenty-one hours and forty minutes after.

If the Ligonier had towed the Douglas up at 7 knots an hour, she could not have reached the Quarantine Station at Marcus Hook (70 miles from the Breakwater till 8:00 P. M., and as the hours of the health officer are from sunrise to sunset (Hanna, p. 207), she would have had to lie at anchor till after sunrise on December 2, and could not have reached League Island before 9:00 A. M. on December 2, and as it was, the Douglas reached League Island about 3:15 P. M., or six and a half hours later.

The two tugs took the Douglas in tow at 9 P. M. on October 26th, and arrived at the Schuylkill at noon on the 27th, taking fifteen hours in towing 84 miles, which is almost six miles an hour.

On the next voyage the Smith started with the Douglas at 9:45 or 10:00 A. M. December 1, and arrived at the Schuylkill at 3:15 P. M. on the 2d (Minford, 190–1), about thirty hours later, but she lay at anchor ten hours. Eighty-four miles in 20 hours towing is four miles an hour.

If the Douglas had been towed at six miles an hour from 10:00 A. M. till sunset at 4:36 (6½ hours), she would have made thirty-nine miles only, and she would not have reached Quarantine till 9:00 P. M., and would have had to lie there for the night. Starting at 8:00 A. M., with 66 miles to go, she would have got to League Island at 10:45. She got there at 3:15 P. M., four and one-half hours later, assisted part of the time by the tug John E. Mehrer. This delay of four and one-half hours was due to the slower speed of the Smith and the Mehrer, while towing her, than the speed made by the two tugs on the previous voyage. There is no reason why two tugs of power equal to the power of the two tugs used on the former voyage should not have been employed on this voyage also. And this delay of the Douglas for four and one-half hours must be held to have been undue delay, giving to the libellant a right to recover damages at the demurrage rate of $12.50 an hour stated in the charter, which is $56.25."

It will be seen that what the commissioner held was that if one or two tugs were used instead of the Ligonier, it, or they, should be of sufficient power to give a speed equal to that attained with tugs on the previous voyage furnished by the respondent. Such speed was not attained on this occasion and there was in that respect undue delay. The allowance seems to be very conservative especially in view of the fact that the terms of the contract that the Ligonier should tow the schooner were violated.

It does not appear that the commissioner has made any error in this respect and the exception is overruled.

2. The next question under the exceptions is whether the commissioner was wrong in disallowing the respondent's claim of $1,420, for 71 hours' detention of the Ligonier at or near Port Arthur, Texas, October 13–16, 1906.

The towing contract provides:

"If at the beginning of any single trip the Douglas is delayed in port through any fault of the Unique Shipping Company, so as not to be ready for sea within twenty-four hours of the readiness of the steamer to tow her, the Unique Shipping Company shall pay demurrage after the said twenty-four hours at the rate of twenty dollars per hour, but the Guffey Company is not required to wait more than forty-eight hours in all, and the Unique Shipping Company may within twenty-four hours after the steamer's readiness give notice that it will not require the barge towed on that trip, in which event it will not be required to pay for that trip if not made."

The commissioner states in this connection:

"Sixth.

Coming now to the consideration of the claim of $1,420 for seventy-one hours' demurrage of the Ligonier at Port Arthur on the October voyage, it is to be noted that there are two contracts.

In the first the voyage is described as 'from Sabine Pass, or Port Arthur, Texas, at shipper's option, to alongside docks at oil stations of Gulf Refining Co. at Bayonne, N. J., or Gibson's Point, Philadelphia.'

In the second the voyage is described as 'from a safe anchorage in New York Harbor to a safe anchorage at Sabine, Texas, and back again.'

The towage service of the Ligonier under the second contract was not to end at any dock or begin at any dock. It was to end at a safe anchorage and begin at a safe anchorage.

The rest of the voyage of the Douglas from that safe anchorage at Sabine Pass through the canal to a dock at Port Arthur was not included in the towage of the Douglas by the Ligonier at all.

Now, the towage agreement, Schedule B, requires the libellant to pay demurrage, if 'at the beginning of any single trip the Douglas is delayed in port through any fault of the Unique Shipping Company so as not to be ready for sea within twenty-four hours of the readiness of the steamer to tow her.' It does not say 'readiness of the steamer to go to sea,' but, 'readiness of the steamer to tow her' (the Douglas).

What is meant by 'the readiness of the steamer to tow her'?

The contract provided that the steamer was to tow the barge 'from a safe anchorage in New York Harbor to a safe anchorage at Sabine, Texas, and back again.'

On the previous voyage the towing back had begun at the Sea Buoy. The Douglas could not complete her loading except at the Sea Buoy, and there, of course, she had been taken in tow on the previous voyage. This action of the parties on the pervious voyage determines the rightful construction of the agreement in dealing with this voyage.

The contract, therefore, required the Ligonier on the fourth and fifth voyages to take the Douglas in tow at the Sea Buoy, and tow her from the Sea Buoy. And she could not be considered to be 'in readiness to tow' the Douglas until she was herself at the place where she was to take the Douglas in tow.

On the fourth voyage the Ligonier anchored off the Sea Buoy on October 15th at noon (Forsbad, Dep. p. 5). Her right to demurrage, then, did not begin until October 16th at noon (twenty-four hours later). The Douglas was ready on October 16th at 1:30, and the Ligonier sailed with the Douglas in tow on October 16th, at 2 P. M. (Jenkins, p. 6). The Ligonier would be entitled, then, to demurrage for one and a half hours, if the delay of the Douglas to be ready for sea until 1:30 P. M. was 'through fault of the Unique Shipping Company.'

The evidence shows that on the 15th a lighter was alongside of the Douglas, from which oil was being pumped into the Douglas; that at 3:40 P. M. that pumping was stopped, 'owing to heavy swell' (log), which made it unsafe for the lighter to lie alongside; that the pumping was begun again at 8 A. M. on the 16th, and the loading was completed at 11:30 A. M.—i. e., in three hours and a half of pumping. She would therefore have been 'ready for sea' at 7:10 P. M. on the 15th, if the pumping had not been stopped by the heavy swell.

That heavy swell was not the fault of the Unique Shipping Company.

Therefore the owners of the Ligonier have no claim for demurrage for the fourth voyage under the agreement.

It is not necessary to consider the happenings before the Ligonier arrived at the Sea Buoy at noon on October 15th. Of all those the Ligonier took the risk. If she had intended to claim demurrage before noon of October 16th, she should have got to the Sea Buoy before October 15th at noon.

It is to be noticed, as bearing upon the question as to when and where the right to claim damages for detention began, that the same condition of things existed at Port Arthur and at Philadelphia. At Philadelphia that right is claimed by the respondent to have begun not twenty-four hours after the Ligonier left the dock at Gibson's Point, but twenty-fours after her arrival at League Island, where the towing was to begin (respondent's brief, p. 32.)"

The question is a narrow one, i. e., whether the Ligonier could require the payment of demurrage without going to the Sea Buoy. The gist of the respondent's argument is contained in the following statement in its brief, viz.:

"When the Ligonier had loaded and come down the channel ready for sea she was 'ready to tow' and it seems a refinement inapplicable to the admiralty to say that she must steam out seawards four miles to prove her 'readiness to tow' when there was no tow there ready to be taken in tow!"

This is based upon a claim that the Douglas preceded the Ligonier in the canal leading from the place of loading at the Guffey wharf at Port Arthur and stopped near the entrance; that she remained within the canal all night thus blocking the exit for the Ligonier, which also remained there all night. The Douglas had already taken aboard as much cargo as she could within the canal and her loading was to be finished outside by a lighter, known as Clarke's Lighter No. 3. The pilot of the Douglas, who had gone home, returned in the morning and took her down to Sabine Pass, about 3 miles, where she anchored at about 10 or 11 o'clock. Meanwhile, as soon as the canal was clear the Ligonier resumed her voyage and came out of the canal, about 11 A. M. and also came to anchor at Sabine Pass, about 2 miles below the mouth of the canal.

The facts seem to be that a grounding of the Douglas while going through the canal delayed her only about 15 minutes. She spent the night in the canal owing to darkness which made it unsafe for her to proceed. The loading of the Douglas began at the dock at Port Arthur on October 11th at 10 P. M., and was completed, as far as it could be there, the 12th at 3:45 P. M., when she proceeded down the canal on her way to sea, expecting to finish her loading outside as was usual and necessary. She reached the southern end of the canal about 7:30 p. m. During the night a storm was prevailing and the next morning the Douglas anchored to await the subsiding of the storm so that she would be able to take further cargo from a lighter alongside. The Ligonier on the 13th came out of the canal, assisted

by a tug, and also proceeded to Newton, two miles below the canal, and anchored there on account of the weather, the master said: "I would hardly have gone to sea; we expected a hurricane, according to indications." In the meantime the respondent had loaded the lighter to complete the cargo of the Douglas. The loading on the lighter was begun October 12th about 9 P. M. and completed the 13th at 3:40 A. M. In the usual course of events, the Douglas and the lighter would have crossed the bar the 13th and completed the former's loading on that day and the vessels have gone to sea without delay. This was prevented, however, by the prevalence of the storm, which made it impossible to complete the loading of the Douglas from the lighter outside the bar. The next morning, the 16th, however, the weather was better, and the loading was resumed and finished by 1:30 P. M.

The original contract provided:

"12. The acts of God, fire, all dangers and accidents of the seas and navigations, and any act or neglect of pilot, master or crew during the term of this contract are always mutually excepted."

The succeeding contract provided:

"There is nothing herein contained that abrogates in any way the provisions of the contract of May 16, 1906, between the same parties. * * *"

The respondent also seeks to obtain the benefit of an alleged detention of the Ligonier on the Douglas's voyage No. 5, contained in the respondent's statement of account in connection with that voyage, viz.:

Demurrage 109 hours
Less free
    time..... 24 " 85 hours at $20...............................$1,700

The commissioner said in this connection:

"On the November voyage the Ligonier anchored at the Sea Buoy on November 17th at 10:15 A. M. Her right to demurrage, therefore, would not begin till the 18th at 10:15.

The lighter reached the Douglas at the Sea Buoy and began pumping at 9:00 P. M. on November 16th (McLean, p. 49), and pumped for three hours, till 12 midnight, when the pipe line was broken by the sea. On the 17th it was not safe to pump on account of the sea, and at 3:30 P. M. the lighter left and went in to Sabine Pass. On the 18th and 19th the weather was so bad that no pumping could be done. The lighter was brought out to the Douglas at 9:00 A. M. on the 18th, but was taken back again on the 19th at 7:00 A. M., and again came to the Douglas at 1:45 P. M. on the 20th. But the sea was so heavy on the 18th and 19th that no pumping could be done.

On the 20th the weather and the sea had moderated, and at 2:30 the pumping was begun and finished at 6:30; Frostadt says 6:45 (p. 9).

At midnight, between the 16th and 17th, then, there were needed but four hours more of pumping to complete the pumping, so that, but for the sea which broke the pipes and prevented the pumping, the Douglas would have been loaded at 4:00 A. M. on the 17th, while the Ligonier did not arrive at the Sea Buoy till 10:00 A. M., of the 17th.

It follows that on this voyage, also, it was the heavy sea, which broke the pipes and prevented the pumping, which delayed the Douglas from being ready within twenty-four hours of the readiness of the Ligonier to tow, which readiness was at 12:15 on the 17th, and that heavy sea was not the fault of the Unique Shipping Company.

It follows that the claim of the respondent for demurrage of the Ligonier at Sabine on the fifth voyage cannot be sustained."

It does not seem necessary to add to what the commissioner has said.

In both instances of the detention of the Ligonier, the testimony indicates clear cases of vis major—Crossman v. Burrill, 179 U. S. 100, 113, 21 Sup. Ct. 38, 45 L. Ed. 106—and within the spirit of the provisions of the contract.

The exception is also overruled.

3. The respondent's brief contains the following:

"The commissioner's interpretation of the word 'fault' in the contract.

This raises an important question of interpretation of what had previously been considered as abundantly settled. Did the weather that rendered oil pumping outside the bar difficult excuse the libellant from paying the stipulated $20.00 per hour?"

The argument in support of the claim of the respondent on this question is, briefly, that to obtain the advantage of such delays as were caused by the inability of the Douglas to take the cargo aboard from the lighter, some special words should have been inserted in the contract, like "Weather permitting" or "Unique Company not to be liable for detention due to heavy weather preventing operation of the lighters beyond the bar" or some similar qualification.

It does not seem, however, that any special words were needed in view of the general provision quoted above. The extraordinary weather which prevailed seems quite sufficient to excuse the libellant from having performed the provisions of the contract, otherwise incumbent upon it. It was not necessary for the libellant to continue loading when the vessels or their pipe connections were subject to peril from the weather conditions.

The commissioner finally reports:

"The result of the whole matter is that the libellant is entitled to recover $1,243.20, with interest from November 1, 1906; also $2,856.80, with interest from December 4, 1906, and $56.25, with interest from December 2, 1906."

No error appears in the report and it is confirmed.