## W. & C. T. JONES S. S. CO. v. BARNES–AMES CO.

(Circuit Court of Appeals, Second Circuit. July 10, 1917.)

### No. 248.

SHIPPING ⬩38—CHARTERS—RIGHT TO CANCEL CHARTER.

Where a charter party gave the charterer an option to cancel if the vessel was not ready to receive cargo by a date specified, such readiness to be shown "by the master's notification accompanied by the underwriters' surveyor's pass to that effect," but provided that the option should be exercised "not later than the presentation of said surveyor's pass of readiness," time was of the essence of the right to cancel, and the charterer, not having exercised its option when the notice and surveyor's pass was presented, could not do so afterwards.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the W. & C. T. Jones Steamship Company against the Barnes-Ames Company. Decree for defendant, and libelant appeals. Reversed.

This cause comes here on appeal from the United States District Court for the Southern District of New York.

The libelant, the W. & C. T. Jones Steamship Company, Limited, was, and still is, a corporation organized and existing under and pursuant to the laws of the United Kingdom of Great Britain and Ireland, and was and is the owner of the steamship Haulwen.

The respondent, the Barnes-Ames Company, was and is a corporation organized and existing under and pursuant to the laws of the state of Minnesota, with an office in the county and state of New York.

On March 3, 1915, the libelant and respondent entered into a charter party at New York City by which the respondent agreed to hire the said vessel for a voyage from Galveston or New Orleans to a port in Italy with a full and complete cargo of heavy grain, which the charterer agreed to furnish, and on which it agreed to pay a freight of 12 shillings per quarter of 480 pounds English weight delivered. The charterers had under the charter the privilege of ordering the vessel to load at New York, and in case the privilege was exercised the rate of freight was to be 11 shillings and no pence per quarter of 480 pounds.

The respondent exercised the privilege of ordering the vessel to load at New York, and the vessel arrived at that port on April 19th, about 2:30 p. m., and written notice was presented at the office of the charterer that the vessel was then lying at a dock specified, and that it was in every respect ready to receive cargo under the charter. This notice was accompanied by underwriters' surveyor's pass of readiness of all holds for cargo.

By the sixth clause of the charter party, if the ship was not ready to receive cargo on or before April 20, 1915, the charterers had the option of canceling.

On April 20th the charterer advised the libelant's broker that it declined to load the steamer, claiming that grain loaded in holds Nos. 2 and 3 would be impregnated with the odor of paint. The owners of the vessel protested against this, and notified the respondent that they would hold the latter liable for all damages, costs, and expenses resulting from breach of charter, and would also endeavor to charter the vessel against the charterers.

Thereupon, on April 22, 1915, the respondent made an offer to libelant to charter the same vessel on conditions substantially identical with those in the charter of March 3d, except that the rate was to be 9s. 6d. instead of 12 shillings a quarter of 480 pounds, and the loading port specified was Philadelphia instead of New York.

⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The offer, it is alleged, was the best that reasonably could be obtained, and was accepted on the agreement that it should be without prejudice, and not a waiver of libelant's claim against the respondent for the breach of the agreement of the charter party of March 3, 1915.

The refusal to load the first charter resulted it is alleged in damage to the libelant to the amount of $19,000, and the libel asked that a decree be entered in favor of libelant for that amount with interest and costs.

The District Judge dismissed the libel with costs, expressing himself as satisfied that the vessel could not carry grain on April 20, 1915, not being at that time in readiness to carry cargo.

Kirlin, Woolsey & Hickox, of New York City (Charles R. Hickox and Cletus Keating, both of New York City, of counsel), for appellant.

Haight, Sandford & Smith, of New York City (Charles S. Haight and Herbert K. Stockton, both of New York City, of counsel), for appellee.

Before COXE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The libelant seeks the recovery of damages for breach of a charter party. The respondent claims justification in refusing to accept and load the steamer in that it is asserted that the vessel was not ready to receive cargo on the stipulated day, inasmuch as two of the holds had been newly painted, and the odor of paint in the holds made them unfit to receive cargo, at least such cargo as the respondent was to load. The vessel was chartered for the purpose of carrying heavy grain, and the record discloses that wheat is heavy grain, and that respondent intended to load that grain upon her.

The libelant claims that the vessel was tight, staunch, and strong, and in every way fitted for the voyage, and was in all respects ready to receive cargo in all her holds in accordance with the provisions of the charter party. The libelant asserts that undoubtedly the real reason for the respondent's refusal to load was not the one assigned, but the fact that the respondent did not want to load, having no grain to ship at that time. It appears that at the time the charter was made respondent had a particular cargo to ship, but later on supposing that the Haulwen would not come out of the dry dock in time to take that particular cargo of grain within the dates specified in the grain contract, went ahead and loaded the cargo on another vessel. So that when libelant tendered the vessel the respondent, as shown by its own testimony, "had no grain of the grade going to the ports for which she was chartered left in New York." And the respondent also testified that if the ship had been entirely satisfactory it "didn't care to load."

At the argument counsel for respondent assumed that the case presented three questions for this court's consideration:

(1) Whether there was an odor of paint in the holds.

(2) If there was, whether such an odor injures wheat.

(3) And if it does whether the respondent was entitled to cancel the charter party.

The District Judge decided all three of these matters in favor of the respondent, and said:

"If it be true (1) that paint odor does injure and deteriorate grain, and (2) that such odor was present and dangerous on the steamship when she was tendered for the purpose of the charter party, then there was a breach of warranty of fitness when the vessel was tendered, and respondent was justified in rejecting the steamer and breaking the charter party on that ground."

The testimony was conflicting as to whether there was an odor of paint in the holds. The respondent produced two witnesses, and two only, who examined the vessel at New York. Neither of them went into the holds. They contented themselves by looking down into them. They testified that they got a smell of paint therefrom. One of these witnesses was the deputy grain inspector for the New York Produce Exchange, and the other was the general superintendent of the International Elevating Company. The first was asked why he did not go into the holds, and he replied that he did not think it necessary to do so, as he could smell the paint without going into them, and that he got a strong odor of paint in holds 2 and 3. The other witness testified that there was a very strong odor of paint from the two holds.

It does not appear whether those witnesses examined the vessel on April 19th or on April 20th. One of them said he could not remember the day, and the other was not inquired of upon this point. One of these witnesses was unquestionably wrong in a part of his testimony. He was asked whether he noticed the condition of the paint around the hatch coamings, and he said he did and felt it. He was then asked, "What did you find?" His reply was, "That it was sticky; it was not dry." The evidence, however, is perfectly clear that the coamings had not been repainted. In connection with this same witness' testimony that he found a strong odor of paint in the holds there is the testimony of the master of the steamer, who was with him at the time of the examination. His testimony was as follows:

"What did he do? He looked down No. 4 first and said, 'That hold is all right.' He looked down No. 3, and he said there was a slight smell of paint. And I asked him to go down the hold. He said he didn't want to go down the hold. Then he went along to No. 2. He asked me what we had been doing. I said we had been repairing; I had bad weather coming across. I asked him if he wanted to see the hold. He said 'No,' he didn't want to go down the hold; there was a slight smell of paint there. And I asked him was not the ship ready for grain. And he said that he couldn't say anything, but he would only say there was a slight smell of paint coming out from the hold."

The vessel inspected was at the time lying at a dry dock, a large repair works. A Norwegian steamer was lying at the time alongside and was being painted. And a number of witnesses who actually went into the holds of the inspected vessel testified that there was a smell of paint on deck, but that when one descended into the holds there was no smell of paint there. Thus a surveyor for the New York Board of Underwriters, who examined her on April 19th at noon, testified that while he was on the deck of the inspected vessel he noticed a smell of paint, and that it came from the ship lying alongside, and that the wind from the westward brought a strong smell of paint across the deck. He was asked whether when he got down into the holds he smelled paint there. His reply was:

"Not to any extent; of course, there was no strong smell of paint in the holds; all fresh painted places will have a peculiar smell of its own, but not a strong smell of paint by any means."

His inspection was a thorough one. He went around the bulkhead, around the frames and examined the rivets. He found the paint hard and the holds "sweet and in fine condition."

Another witness, a marine surveyor, testified that he examined the holds on April 19th and that he did not find any strong odor in the holds. That he examined the holds again on April 20th about 9:30 a. m., and testified that at that time he did not find any odor of paint in the holds. He states that he paid special attention as to whether there was any smell and he could not observe any. He had gone into the holds for the very purpose of examining to find whether there was any odor of paint present, having been asked between 4 and 5 o'clock on the previous day to find out that very thing. He was at that time informed that that criticism had been made. This would seem to indicate that the two witnesses who examined the vessel, and upon whom the respondent relies, had made their examination some time on April 19th. This witness when told of the criticism replied:

"That is very funny. I can't go now, but I will go in the morning."

It seemed "funny," no doubt, as he had previously examined the vessel and had noticed the strong odor of which complaint was made. The painter who did the painting examined the holds on the morning of the 19th, and testified that at that time the odor was "not much, but a very little bit."

The testimony shows the painting was finished on April 18th about 4:30 p. m. The paint was a quick-drying paint, a red oxide, and the manufacturer of the paint testified it took such paint from 4 to 4½ hours to dry.

A careful reading of the testimony satisfies me that on April 20th the paint in the holds was beyond doubt dry, and that, if there were any odor of paint in holds 2 and 3, it was slight, and that there is some reason for thinking there was no odor at all.

The testimony was also conflicting as to the effect of an odor of paint on a cargo of wheat. The master of the vessel testified that he had on several occasions loaded cargoes of grain the day after the holds had been painted, and that he had never had any claim for damages for grain so carried. He also testified that he had never seen a boat better suited for grain than this boat was. One of the managing owners of the company which owned the vessel in question, the vessel being one of 13 which the company owned, testified that it very frequently happened that a vessel was painted just before grain was loaded. The vessels were all of them practically used exclusively in the grain trade, and he testified that during his 25 years of experience he could not recall that a single claim for damage to grain by taint or odor from paint had ever been made. The vessel was classed at Lloyd's as 100A1.

Another witness, the captain of a cargo steamer, and who had had 7 years' experience in carrying grain cargoes, and who had carried about 50 of such cargoes, was asked:

"Captain assuming that red oxide paint was put on a ship's hold and that the hatches were left off, how long, in your opinion, would it be advisable to wait before grain was loaded into the hold?"

His answer was:

"I should say 24 hours after."

Another witness, a surveyor whose business it is to examine vessels as to their fitness to receive grain cargoes, testified that 24 hours after the holds of a vessel had been painted she would be in first-class condition so there would be no damage to the grain.

The respondent put on the stand as an expert the general manager of the American-Cuban Steamship Line for its stevedoring business, and he was asked the following question:

"From your experience would it be safe to load grain in bulk into the hold of the ship which had been so recently painted that around the rivets and at the butts of the plates and down the angle irons there was still raw paint, and the hold had a very strong odor of paint?"

To which he replied:

"Well, it would not be safe; positively wouldn't be safe."

Other witnesses testified that wheat is a very delicate grain and susceptible to odors of paint; wheat and barley being the most susceptible of the grains to such odors. The two witnesses who testified that there was a strong odor of paint in the holds 2 and 3 testified also that on account of that odor the ship was not fit to receive grain.

But, as I am not convinced that on April 20th there was any strong odor of paint in the holds, I am not persuaded that on the day named the ship was not fit to receive cargo. If, however, I am mistaken in this respect, it is a matter of no consequence, for the decision is not based on any such ground, and my Colleagues in this court express no opinion thereon. I have reviewed the testimony as to the odor of paint and its effects because of the stress placed upon the testimony at the argument and because the testimony impressed the District Judge differently, and led him to a dismissal of the libel. The issue involved lies in a narrow compass.

The respondent in its answer claimed the right to cancel by virtue of the sixth article of the charter party, which reads as follows:

"6. Charterers shall have the option of canceling this charter party if the vessel be not ready to receive cargo on or before the 20th day of April, 1915. Such readiness shall include the arrival of the vessel at the loading port, entry thereof at the custom house, and all compartments ready to receive cargo as shall be shown by the master's notification accompanied by the underwriter's pass to that effect, which must be presented at the office of the charterers or their agents at or before 4 p. m., or, if on Saturday, before 12 o'clock noon on said day. This option to cancel shall be exercised not later than the presentation of said surveyor's pass of readiness."

The article expressly gave the charterers the option of canceling "if the vessel be not ready to receive cargo on or before the 20th day of April, 1915." It is admitted that the notice was given on April 20th. But the clause which gave the option provided that:

"This option to cancel shall be exercised not later than the presentation of said surveyor's pass of readiness."

And the surveyor's pass of readiness was presented about 2:30 p. m. on April 19th. The respondent not having exercised the option until the day after the surveyor's pass was presented, the right of option

given under the charter was gone by the very terms of the clause which conferred it.

The option to cancel was made a matter of contract, and it could be exercised only by strict compliance with the terms on which it was given. Time was of the essence of the agreement. Inasmuch as respondent did not exercise its option to cancel within the time allowed it by the terms of the charter party, it was not allowable for it to exercise it thereafter; for, once a charterer lets the canceling day mentioned in the charter go by, he waives the right which the charter gives him to cancel, and abandons his right to cancel if the vessel is not ready to load by the day specified. Readiness to load includes fitness to receive cargo. And, as the notice of cancellation was given after the time for giving it had expired, it was without effect.

There is, moreover, an additional reason why the right to cancel did not exist. The sixth article of the charter party above set forth discloses that the parties agreed on the evidence which should establish the "readiness" contracted for. That readiness was to be "shown by the master's written notification, accompanied by underwriters' surveyor's pass to that effect," which had to be presented at a certain time and place, and which was so presented in strict compliance with the agreement. The obvious purpose of this provision as to what the proof should be of the fact of readiness was to prevent just such a dispute as has arisen in this case. The proof which the parties agreed upon had been furnished by the plaintiff, and the respondent was concluded thereby in the absence of any allegation of fraud, and no such allegation has been made.

Decree reversed.