### THE GOYAZ (two cases).

(District Court, S. D. New York. April 26, 1922.)

1. **Admiralty ⬳50—Courts ⬳332—Rules do not authorize court to enforce nonmaritime contract, or the bringing in of parties whose rights rest on nonmaritime contracts.**

Rev. St. § 917 (Comp. St. § 1543), authorizing the Supreme Court to prescribe rules of practice in the District Courts in equity and admiralty, does not confer power to enlarge the jurisdiction of such courts, and new admiralty rule 56 (267 Fed. xxi), permitting a claimant or respondent to bring in any other parties, who may be partly or wholly liable, either to libelant or to such claimant or respondent, does not authorize the bringing in of a party whose liability, if any, rests on a nonmaritime contract.

2. **Shipping ⬳121(1), 128—Liability of ship for damage to cargo of hides.**

A steamship *held* not liable for damage to a cargo of pickled hides, except as to a small number stored in one corner of a hold, which were apparently damaged by sea water; the damage to others, distributed throughout the cargo, being due to causes existing when they were loaded.

3. **Shipping ⬳132(5)—Repairs of ship held not to warrant inference of previous unseaworthiness.**

The fact that extensive repairs were made to a vessel after a voyage *held* not to warrant an inference that damage to cargo on such voyage

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was due to unseaworthiness, where the repairs were not made to correct defects which could have caused the damage.

In Admiralty. Suits by the Central Leather Company and by Schmoll Fils & Cie. against the steamship Goyaz, with Thomsen & Co., impleaded. Decree for libelant Central Leather Company, and dismissed as to Schmoll Fils & Cie. and impleaded respondent.

Purrington & McConnell, of New York City (W. A. Purrington and Frank J. McConnell, both of New York City, of counsel), for The Goyaz.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, Henry D. Potter, and Corning G. McKennee, all of New York City, of counsel), for libelants.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles C. Burlingham, Charles Burlingham, and Carl Stearns, all of New York City, of counsel), for Thomsen & Co.

WARD, Circuit Judge. These two cases, the first to recover for damages to 70,000 wet salted hides belonging to the Central Leather Company, and the second for damage to 5,000 wet salted hides belonging to Schmoll Fils & Cie., were tried together; the only difference between them being that in the first case there was an additional claim for short delivery of 54 hides.

The libelants allege that the hides were shipped on the steamer Goyaz at Rio Grande do Sul, Brazil, in good condition, and were delivered at New York in bad condition, and they attribute this to contact with sea water due to unseaworthiness of the steamer. The answer of the claimant of the steamer denies that the hides were shipped in good order, or that there was any short delivery in the case of the Central Leather Company's shipment.

[1] By petition under the fifty-ninth rule in admiralty (29 Sup. Ct. xlvi), the claimant brought in the shippers of the hides, Thomsen & Co., who were also the charterers of the steamer, alleging that they had by express agreement the sole charge of and responsibility for loading, and that if the hides sustained any damage on the voyage it was due to bad stowage and loading.

The method of tallying the hides as shipped was very inaccurate, and I find that the steamer delivered all the hides she received. The claim for shortage will therefore be disallowed.

At the trial all parties admitted that the stowage was usual and proper. At all events, there was no evidence whatever that it was not. Therefore the petition will be dismissed as to the respondents Thomsen & Co., with costs against the claimant. There could be no other liability upon their part, except for shipping bad hides, which is no concern of the claimant, and a contract of sale not being maritime, the court had no jurisdiction whatever of the subject-matter. The holders of the bills of lading could only recover damages of Thomsen & Co., the sellers, in an action at law.

In The Ada, 250 Fed. 194, 162 C. C. A. 330, the Circuit Court of Appeals for this circuit held that a contract to be enforced in admiral-

ty must be wholly maritime. It is true that the fifty-ninth rule in admiralty was not there under discussion, but the case of Evans v. Steamship Co. (D. C.) 145 Fed. 841, was disapproved. See the cases there considered.

The power of the Supreme Court to enact rules regulating the District and Circuit Courts was given by section 6 of the Act of August 23, 1842 (5 Stat. 518), which reads:

"And be it further enacted, that the Supreme Court shall have full power and authority, from time to time, to prescribe, and regulate, and alter, the forms of writs and other process to be used and issued in the District and Circuit Courts of the United States, and the forms and modes of framing and filing libels, bills, answers, and other proceedings and pleadings, in suits at common law or in admiralty and in equity pending in the said courts, and also the forms and modes of taking and obtaining evidence, and of obtaining discovery, and generally the forms and modes of proceeding to obtain relief, and the forms and modes of drawing up, entering, and enrolling decrees, and the forms and modes of proceeding before trustees appointed by the court, and generally to regulate the whole practice of the said courts, so as to prevent delays, and to promote brevity and succinctness in all pleadings and proceedings therein, and to abolish all unnecessary costs and expenses in any suit therein."

It will be seen from the foregoing that no authority was given to the court to enact substantive law, but merely to regulate the practice in those courts, and the order of the Supreme Court promulgating new Rule 56 (267 Fed. xxi) so reads:

"It is now here ordered by the court that the rules of practice for the courts of admiralty of the United States this day adopted and established by the court be and the same are hereby promulgated as such to be in force on and after March 7, 1921.

"December 6, 1920."

Certainly no intention upon the part of the court to enact substantive law can be found in the fifty-ninth rule, which governs the present case. If such an intention could be discovered in the larger language of the new rule 56, which went into effect March 7, 1921, then it cannot be construed to take effect retroactively and to apply to this case. Furthermore, construed as intending to enact substantive law, it would be beyond the power of the court, because it would not be a regulation of practice, but would extend the jurisdiction of the District Court to include nonmaritime subjects and would deprive third parties brought in of their right to a jury trial guaranteed by the Seventh Amendment of the Constitution.

[2] Thomsen & Co. took 107 depositions and the claimant 84 depositions in Brazil as to the condition of the hides when shipped and as to the circumstances attending the shipment. They are so absolutely contradictory, and so full of obvious exaggerations and inconsistencies, that I can come to no satisfactory conclusion from them as to the condition of the hides when shipped. They should have been delivered well pickled, but in accordance with the usual practice they were pickled again when stowed. Salt was laid on the deck, and then salt put upon each layer of hides and brine; that is, water from the bay, saturated with some 26 per cent. of salt, was poured from buckets over the salt. The hides on each side of the deck were turned up, so as to make

a sort of receptacle to hold the brine in, and there was between the outside hides and the skin of the vessel mats, leaving an open space of a foot or more. Any of the brine not absorbed by the hides would remain in pools, which would gradually leak through to the bilges. Pools of brine would not damage the hides at all, but only take the place of any of the original pickle which might have seeped through them. On the other hand, the water of the Pacific, said to contain but 5 per cent. of salt, would dissolve the pickle in the hides, permit incipient putrefaction to develop, and eventually destroy them. A layer of salt was put upon the top of the hides in the upper 'tweendecks, through which any sea water from the deck would penetrate, but this layer was found intact when the hatches were opened upon arrival at New York.

The deck and engine room logs of the steamer on the voyage were kept in a most orderly way, and they, together with the testimony from officers and crew of the steamer, satisfy me that the voyage from Rio Grande do Sul till the steamer got well past Barbados was entirely without incident. From December 12th to 15th, inclusive, and 17th and 18th, inclusive, very rough weather was encountered, seas frequently breaking over the decks and doing damage to cabins, toilets, and the crew's quarters. This is a very common occurrence, and should not cause injury to cargo under dock of a seaworthy vessel. It is true that there was frequently a good deal of liquid, whether pickle or sea water, in the bilges; but that did no harm, so long as they were kept from overflowing. The engine room log shows that on December 17th, in the 4 to 8 a. m. watch, a large quantity of water was discovered in the bilges of the engine room and of the cross-bunker at the starboard side, so that it was necessary to start the bilge pump going. This was also found again in the watch 4 to 8 p. m., so that it was necessary to bail out the water in the stoke hole with buckets, and to clear the bilges of the cross-bunker and to clear the pumps, which were obstructed with coal. There was still a large quantity of water in the bilges of the stoke hole bunkers in the 8 to 12 p. m. watch, and again in the 4 to 8 a. m. watch of the 19th.

As long as the sea water did not overflow the bilges, no harm would be done; but upon arrival 47 hides were found thoroughly rotten on the after starboard corner of No. 2 hold. This was evidently caused by sea water, which had risen above the bilges and the tank tops into the hold at that point; the steamer being as usual down by the stern. For this damage the steamer is liable. This was the only defined spot where damage was discovered. If sea water had entered at other points, similar damage would have appeared; on the contrary, the other defective hides were found promiscuously throughout the cargo. Some 900 hides of the shipment of Schmoll Fils & Cie. were damaged, but no agreement was reached as to the amount of damage. In the case of the shipment of the Central Leather Company, the surveyors agreed upon damage to the extent of 53⅓ per cent. The claimant contends that this was a mere estimate to fix the amount of the stipulation to be given for the steamer's release, whereas the libelant insists that it was the determination of the actual damage. The fact that the agreement was made February 14th, after the steamer was released

upon filing stipulation for value February 3d, and the correspondence between the parties and the testimony satisfy me that the libelant is right on this point.

Putrefaction in a hide is caused by heating, and the indication of heating is that the hair can be easily scraped off the hide with a knife, especially if the flesh side of the hide shows a pinkish color. From that it goes on, if not properly pickled, to red, green, blue, and black, which latter colors indicate rottenness. Incipient putrefaction, however, does not damage the hide for tanning purposes, unless the loose hair carries off, not only the epidermis or outside skin, but also the grain or corium of the hide, and this cannot be discovered by visual examination, but only in the process of tanning. No visual examination, either at Rio Grande do Sul or at New York, would disclose it. Damage should be ascertained when the hides are delivered, and it is the practice to do so. Hair slip, accompanied by pinkish or reddish color of the skin, is regarded as proof of damage, and the amount is usually agreed upon at the survey.

Such hides are commercially damaged, because a consignee cannot sell them as sound. The allowance he will have to make to a purchaser will measure his actual loss. If, however, the consignee intends not to sell, but to tan, the hides, he can subsequently ascertain just how far the grain of the hide, as distinguished from the epidermis, has been injured. I do not know whether the libelants intended to tan the hides themselves, or to sell them to tanners. In the case of the Central Leather Company's shipment this makes no difference, because the actual damage was agreed upon as 53⅓ per cent. between the surveyors for the leather company, for the ship, and for the underwriters.

Even if putrefaction has begun to set in, it will be entirely stopped if the hide is properly pickled, that is, saturated with water containing some 26 per cent. of salt; and a putrefying hide will not damage the hides around it, if they are properly pickled. The fact that the damaged hides were scattered promiscuously through the cargo, except in the one case of the local damage to 47 hides at the after starboard corner of No. 2 hold, satisfies me that the defects discovered in the other cases existed when the hides were shipped, and were not caused by sea water coming aboard during the voyage and dissolving the pickle.

The bills of lading said nothing about the condition of the hides when shipped, but of course they must have been in as good condition upon shipment as they were on delivery. No one can now say whether the real damage to them for the purposes of making leather was as great as the amount agreed on; but this has been covered by the agreement made between the ship, the libelants, and the underwriters.

[3] It is argued that, because repairs so extensive as to cost $132,-000 were made on the steamer after the cargo was discharged, I should infer that she was unseaworthy; but only such repairs as were necessary to correct defects which would let sea water into the cargo are of any importance. Unseaworthiness which caused damage is to be considered. A large part of the original teak wood sheathing of the shelter deck was taken up and replaced, but there is no evidence that the teak wood deck was so defective as to let water through to the

continuous steel deck under it, or that the steel deck itself was so defective as to let such water, if it came through, into the upper 'tween-decks. On the contrary, the evidence of the men from Morse's shipyard, who made the repairs, and of a number of the surveyors, is that there was no indication of any defect on the weather deck likely to injure the cargo. Indeed, the libelants do not contend that there could have been any extensive injury so caused.

New tops were put on some 14 ventilators. This appears to have been done, as much of the other repairs were done, for appearance sake, not because of any actual necessity. Some cracked ports were replaced, but as they were backed by covers fitted with gaskets, there is very little likelihood of sea water getting through them. Both hawse pipes were removed, because the anchor chains had worn the edges of the hawse holes; but the evidence is that they were properly packed, and that no water could have got into the vessel through the hawse pipes.

Some plates were cut out and renewed on the forepeak bulkhead, where there was a hole opposite the chain locker, which was on the after side of the bulkhead. Any water going through that hole would have gone down through the chain locker into the forward bilges. The winches, being shaky on their foundations, were taken up to be repaired, and, the steel deck under the foundations showing more or less corrosion, new deck plates were put in.

A number of suction lines were renewed, because they had been wrapped in various places to cover leaks, and some sounding pipes were renewed, because they had broken from the flanges of the caps which covered them on deck. The evidence is that the caps themselves were sound. There is no reason why any water coming aboard should have got into the cargo for these reasons. Other defects were pointed out, but I am not willing to infer from any of them that sea water got into the cargo and damaged hides not in the locality of the defects, but promiscuously throughout the holds.

It also appeared that the steamer had lost her classification in 1914, but this was indicated in the register by a red line, which means, not that she was unseaworthy, but that she had not complied with the classification rules; e. g., had not submitted to a periodical survey required by the rules. This only shows that the owners did not care to have her classified, which is sometimes the case. If she had lost her class because of any defect, it would have been indicated on the register by a black line.

I think the libelants have not made out their case. The libel of Schmoll Fils & Cie. will be dismissed, with costs, and the petition against Thomsen & Co. will be dismissed, with costs against the claimant, and there will be a decree in favor of the Central Leather Company for the damage to the 47 hides injured by sea water, and if the amount is not agreed upon a reference to a commissioner will be ordered, to ascertain the same with interest, but without costs.