---

### AKTIESELSKABET FIDO v. LLOYD BRAZILIERO et al., and six other cases.*

(Circuit Court of Appeals, Second Circuit. June 19, 1922.)

No. 289.

1. **Shipping ☞184—Evidence held to prove neither shipowners nor charterer at fault as to character of coal loaded on vessel for stiffening, or method by which it was loaded on vessel.**

In libel by shipowner against charterer, who had chartered vessel for transportation of coal, and, as required by charter, had furnished sufficient cargo at port of discharge under previous charter for stiffening to enable vessel to shift ports, for demurrage during delay caused by overheating of coal stiffening, making it necessary to discharge such stiffening and load entirely new cargo, in which charterers filed cross-libels to recover expenses incurred in discharging heated stiffening and replacing it with other coal, or to recover contribution in general average, evidence *held* to prove that neither the owners nor the charterers were at fault, either respecting the character of the coal loaded on vessel for stiffening or the method by which it was loaded.

2. **Shipping ☞181—Lay days did not begin to run until removal of heated coal stiffening.**

Where charterer, who had chartered vessel for transportation, delivered sufficient coal at port of discharge under previous charter for stiffening to enable vessel to shift ports, and where, because of overheated condition of such coal, it was necessary to discharge it and load entirely new cargo at the port from which the coal was to be transported under the charter, and where neither owners nor charterers were at fault, either in character of coal stiffening or method of loading, the lay days did not begin to run until the heated coal stiffening was removed, notwithstanding provision in charter party for "lay days to count from the time captain gives notice of readiness to proceed to loading berth," or notice given thereunder, before the discharge of the coal stiffening was recommended, that the vessel was ready "to proceed to loading berth," since such notice was not effective, inasmuch as the vessel was not in fact ready.

3. **Shipping ☞175—Overheating of coal stiffening not a "default" of charterers, within provision as to payment of demurrage.**

Where charterers, who had chartered vessel for transportation of coal, delivered sufficient cargo at port of discharge under previous charter for stiffening to enable vessel to shift ports, but the coal so de-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 258 U. S. ——, 43 Sup. Ct. 97, 67 L. Ed. ——.

livered was overheated, making it necessary to discharge coal and load entirely new cargo at point from which coal was to be shipped, the charterers were not required to pay demurrage for each day of detention by their own "default," since the overheating of the coal stiffening was not a "default" within the charter, but was an extraordinary and unusual occurrence, which could not have been anticipated when charter was made.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Default.]

4. Shipping ☞189—Losses constituting a claim to general average contribution stated.

All losses in a maritime adventure falling outside the contractual obligations of the parties, and which arise from a voluntary sacrifice of a part of the cargo, made to save the whole adventure from perishing, or which arise out of extraordinary expenses or expenditures of money incurred for the joint benefit of both ship and cargo, constitute a claim to general average contribution.

5. Shipping ☞194—Loss caused by delay necessitated by overheating of coal stiffening held to constitute a claim to general average contribution.

Where charterer, who had chartered the vessel for transportation of coal, delivered sufficient cargo at port of discharge under previous charter for stiffening, but coal so delivered was overheated at port from which the coal was to be transported, requiring the discharge of such coal and the loading of entirely new cargo, the loss caused by the delay constituted a claim to general average contribution, since there was an imminent peril common to all interests, a voluntary, deliberate, and intentional necessary act of sacrifice or expenditure made to preserve all interests, and the act was attendant with success and the peril avoided.

6. Admiralty ☞50—Admiralty rule, entitling party to bring in other vessel or person, construed.

Admiralty rule No. 56 (267 Fed. xxi), providing that in any suit, either in rem or in personam, the claimant or respondent shall be entitled to bring in any other vessel or person who may be partly or wholly liable to the libelant, or to such claimant or respondent, by way of remedy over, contribution, or otherwise, growing out of the same matter, does not enlarge the admiralty jurisdiction by permitting a party to be impleaded in a matter respecting which it would otherwise have no jurisdiction, but merely permits the respondent to bring in a party jointly liable for the wrong complained of in a case within the admiralty jurisdiction, whether the case is one of collision or not.

7. Admiralty ☞10—Does not take cognizance of agreements not in themselves maritime.

Admiralty jurisdiction extends to all maritime contracts, but does not take cognizance of agreements not in themselves maritime.

8. Courts ☞332—Supreme Court cannot give admiralty jurisdiction over cause of action within sole jurisdiction of common law by means of a rule in admiralty.

Act Cong. Aug. 23, 1842, § 6, giving the Supreme Court power to prescribe the forms of writs and other processes to be used in the District and Circuit Courts, and the forms and modes of framing and filing libels, bills, answers, and other pleadings, in suits at common law or in admiralty and in equity, did not empower the court to give a court of admiralty jurisdiction of a cause of action within the sole jurisdiction of a court of common law.

9. Admiralty ☞50—Courts ☞332—Respondent could not, under court rule, implead third party, where cause of action asserted was one within sole jurisdiction of court of common law.

In action by shipowner against charterer for demurrage during delay caused by overheating of coal stiffening, delivered by charterer at port

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of discharge under previous charter to enable vessel to shift ports, the seller from whom charterer had purchased the coal could not be impleaded by charterer, on theory that seller was liable to indemnify charterer because of unfitness of coal, notwithstanding admiralty rule 59 (29 Sup. Ct. xlvi), entitling the respondent in such case to bring in other party, who was partly or wholly liable to libelant or claimant or respondent, since the cause of action against seller for unfitness of coal was solely within the jurisdiction of a court of common law, and could not be placed within the jurisdiction of admiralty courts by an admiralty rule.

Appeals from the District Court of the United States for the Southern District of New York.

Libels in admiralty by the Aktieselskabet Fido against the Lloyd Braziliero and others, by the Aktieselskabet Christianssand Corporation against the Cia Commercio E. Navegacao Company, by the Skibsakties Glommen against the Chesapeake & Ohio Coal Company, by the Skibsakties Clyde against John S. Sorenson and another, by the Bachs Rederi Akties against the American Coal Export Company by the Christianssand Shipping Co., Limited, against the American Coal Exporting Company, and by the Aktieselskabet Christianssand Corporation against the Berwind-White Coal Mining Company, in each of which suits cross-libels were filed. From the decree, dismissing the libels and sustaining the cross-libels (267 Fed. 733), the libelants appeal. Affirmed.

Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight and Wharton Poor, both of New York City, of counsel), for appellant Aktieselskabet Fido.

Macklin, Brown, Purdy & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for appellee Knickerbocker Fuel Co.

Burlingham, Veeder, Masten & Fearey, of New York City, for appellees charterers of Tjong and Svalen.

Purrington & McConnell, of New York City, for appellee Lloyd Braziliero.

Herbert Green, of New York City, for appellees Berwin-White. Coal Mining Co. and American Coal Exporting Co.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (John M. Woolsey and Delbert M. Tibbetts, both of New York City, of counsel), for appellees Sorenson & Nielson and Chesapeake & Ohio Coal & Coke Co.

John L. Galey, of New York City, for appellee Gano, Moore & Co., Inc.

Macklin, Brown, Purdy & Van Wyck, of New York City, for appellee Knickerbocker Fuel Co.

Henry W. Harden, for appellee New York & Philadelphia Coal & Coke Co.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for appellee Pocahontas Fuel Co.

James K. Symmers, of New York City, for appellee Consolidation Coal Co.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. These causes arise out of controversies between the libelants, as owners of seven Norwegian steel sailing vessels, and their charterers, together with certain coal companies impleaded by the charterers. The causes were heard together in the court below, and were disposed of in a single opinion. They were argued together in this court, and will be determined here in one opinion.

The libelants are corporations existing under the laws of the kingdom of Norway, and as owners of their respective ships entered into charter parties with the respondents; the libelants agreeing to carry and the respondents agreeing to ship on each of the vessels a full cargo of coal from Hampton Roads, Va., to a designated port in South America. These charter parties were entered into in the summer of 1918, during the European War. At that time the government compelled all shippers of coal from the United States to South America to ship in vessels allocated to them by the United States Shipping Board under a form of charter which it prescribed, and during the period involved herein the shipment and supply of coal at all tidewater points was under the control of the United States Fuel Administration, working through the Tidewater Coal Exchange, and all miners and operators were compelled to consign their coal destined for the seaboard to the Tidewater Coal Exchange, by whose representative it was inspected at each port.

The Exchange originated in July, 1917, and was originally a voluntary organization, brought into existence at the instance of the Council of National Defense, with the co-operation of the railroads and coal operators. But in November, 1917, the United States Fuel Administrator issued an order making it obligatory upon every shipper of bituminous coal for transshipment at any one of the tidewater ports, where the Exchange operated, to consign all shipments of coal to the Exchange. The Exchange was established to expedite the transshipment of coal at tidewater points, and to secure the prompt release of coal cars at the various ports. See In the Matter of Tidewater Coal Exchange, 280 Fed. 638, decided by this court in February, 1922. All mines from which coal was shipped to tidewater were classified into pools, in accordance with the grade and source of the coal. All coal on its arrival was inspected by the representatives of the Exchange, who rejected any coal that did not come up to the specifications of the pool. The quality and preparation of the coal was a matter entirely under the supervision of the United States Fuel Administration, exercising its functions through the Tidewater Coal Exchange.

The seven ships involved in the cases now before the court are the Fjong, Svalen, Baunen, Clyde, Trio, Dvergso, and Songvig. The ships were chartered by various charterers to carry cargoes of coal from Hampton Roads to Rio de Janeiro, in Brazil, or to Rio Montevideo, in Uruguay, or to Buenos Aires, in the Argentine Republic, one port only, as ordered on signing bills of lading. The several charters were all in the same form, each being headed "U. S. S. B. (United States Shipping Board) Form Charter (under Norwegian Sailing

Vessel Agreement)." They contained the anomalous provision that the charterer should furnish ballast, or a part cargo of coal, as stiffening, to enable the vessels to proceed from their inward ports of discharge under previous charters. The relevant clauses of the charter party are:

"(2) If vessel is required to shift from her last port or berth of discharge in the United States to another port or berth to load, charterers shall furnish sufficient cargo or ballast for stiffening to enable vessel to shift ports or berths safely. Charterers to pay cost of towage, but time for shifting ports not to count as lay days. If ballast is furnished for stiffening to enable vessel to shift ports or berth safely, all cost, including loading and discharging, to be paid by charterers and time to count as lay days, just as if cargo was used for stiffening. Stiffening to be supplied when and where required or lay days to count. Master to give 48 hours' notice of readiness."

"(5) Cargo to be delivered to vessel, loaded and stowed free of expense to vessel, and to be discharged by charterers or their agents at their expense. Master to give free use of vessel's winches, donkey boiler, and such tackle as may be on board. Vessel to be free of all lighterage.

"(6) It is agreed that lay days for loading and discharging shall be as follows (if not sooner dispatched): Commencing from the time vessel reaches loading or discharging port or dock, or berth, if available and master has filed written notice to that effect, and all customs formalities have been complied with. In the event of berth for loading or discharging not being available, lay days to count from the time captain gives notice of readiness to proceed to loading or discharging berth; vessel being duly entered and all other customs formalities complied with.

"(7) Cargo to be loaded at the average rate of not less than 250 tons per running day, Sundays and holidays excepted, and to be discharged at the average rate of not less than 250 tons per running day, Sundays and holidays excepted, time reversible; i. e., any time saved at loading port to apply at port of discharge. Charterers to have the privilege of working vessel on Sundays and holidays, if they so desire, provided they pay all extra expenses and overtime actually incurred by working cargo in connection with ship and cargo. Sundays and holidays so used not to count as lay days.

"(8) And for each and every day's detention by default of said party of the second part or agents twenty cents per ton, U. S. gold, of vessel's agreed deadweight capacity, and pro rata for part of a day, shall be paid by said party of the second part, or agents, to the party of the first part, or agents, payable day by day as earned. * * * "

An examination of the charter party shows that the charterers had the option of furnishing either sufficient cargo or ballast for stiffening to enable vessel to shift ports, or berths, safely. They all elected to furnish cargo for stiffening purposes, presumably to avoid the expense of furnishing ballast. All the vessels, with the exception of the Clyde, having arrived in New York, their inward port of discharge under their previous charters, arrangements were made with reputable coal dealers at New York for a certain amount of bituminous steam coal to be delivered to them at New York, to be used as stiffening for sailing vessels on voyages to South American ports. The loading of the stiffening was from lighters, which were put alongside the vessels by the charterers. The loading of the vessels with stiffening was necessary, as it is agreed that the vessels could not have stood up without either cargo or ballast in their holds. In the case of the Clyde the loading of the stiffening was done at Baltimore in September; the vessel having been tendered at that port.

The vessels, having taken on board the amount of coal stiffening

they required, were towed to Hampton Roads by tugs furnished by the charterers, where the loading of the coal cargo, which they were to carry to South America, was to be effected either at Norfolk or at Newport News; these being two great coal ports of the United States, lying close together at the mouth of the James river on Chesapeake Bay, Hampton Roads being the name of a channel in that bay. The loading of the Songvig was done at Newport News, but the other six were loaded at Norfolk. The method of loading at both places was substantially the same; the vessels being brought alongside certain coal piers, from which the coal was dumped into the vessels through chutes.

On the arrival of the vessels at Hampton Roads, the loading berths were occupied by other vessels having precedence in accordance with the rules of the port, and they had to await their turn. After their arrival at Hampton Roads, and while the vessels were waiting their turn to be loaded, it was discovered that the coal stiffening which they had on board had become so heated as to make it unsafe to load the balance of the coal cargoes and for the vessels to proceed on their voyage. The stiffening was accordingly discharged from the vessels and entire new cargoes were loaded, and the ships then proceeded to their respective destinations. All the parties agree that the discharge of the heated stiffening was necessary, and at the time the fact of the heating was discovered all agreed that the action taken respecting it should be without prejudice to any of the rights of the parties respecting the matter involved.

Much expert testimony was taken in the court below as to the heating of the coal. Into this interesting question as to the spontaneous combustion of the coal we need not particularly inquire. The court below thought that no satisfactory explanation had been given why the coal heated. The cause of it seems to be a matter of more or less speculation. The extreme heat of July and August, 1918, probably affected the coal while lying in open steel cars and in open barges, and the fact that these steel vessels were high out of water while waiting to complete their loading, and were exposed to the sun, and their great empty spaces became heated from the hot steel plates and were without ventilation, seem to indicate the probable cause of the trouble, and appear to have been contributing factors to the result. But the difficulty which these vessels encountered was not confined to them. A great number, if not, indeed, the great majority, of sailing vessels taking aboard coal stiffening in July, August, and September, 1918, not only at New York, but also at Baltimore and Philadelphia, experienced the same trouble.

The overheating of the coal, however it may have been caused, made necessary the removal of the coal, and caused much delay in reloading and increased expense. It caused this litigation; a difference of opinion having arisen between the owners of the ships, on the one hand, and the charterers, on the other, as to the rights and liabilities of the respective parties. The result was that these libels were filed, upon the theory that the respective owners of the ships were entitled to recover demurrage from the charterers, on the ground that the time

the vessels were delayed in Hampton Roads after they reported their readiness to proceed to a loading berth should be counted as lay days. The respective charterers denied this in their answer, and, contending that the lay days did not begin until the heated stiffening had been discharged, filed cross-libels, in which they claimed a right to recover the expense incurred in discharging the heated stiffening and of replacing it with new stiffening as for ship's account, or, if this claim were not sustained, then the right to recover contribution from the owners in general average, and in some of the cases for the value of the heated stiffening at destination, less freight and proceeds of sale, and in some of the cases for dispatch money for time saved in loading and discharging.

In addition, in all the cases, except that of the Songvig, the charterers petitioned under the fifty-ninth (now the fifty-sixth) admiralty rule (267 Fed. xxi) that the vendors from whom they had purchased their coal stiffening be made parties, as being liable to indemnify them against any recovery by the owners, because of the unfitness of the coal for shipment. In the Songvig case the charterer (the Berwind-White Company) itself furnished the stiffening. The District Court dismissed the libels and sustained the cross-libels.

[1] We are fully satisfied that neither the owners nor the charterers were at fault, either respecting the character of the coal or the method by which it was loaded. The testimony certainly does not disclose negligence on the part of the charterers as respects the character of coal loaded on the vessels. The coal was ordered by them of responsible dealers. The orders they gave called for high-grade coal. The coal furnished had passed the inspection provided for by the rules of the Tidewater Exchange. The coal furnished to the Songvig, for example, was similar to the preferred coal of the United States Navy, and which was used during the war to coal the United States war vessels at New York, as well as the great transatlantic steam vessels of the Cunard, White Star, and other great lines. So, in the case of the Clyde, the evidence was that the coal used was the best coal available at Baltimore, where, as we have seen, that vessel was loaded.

There was nothing in the appearance of any of the coal to indicate unfitness. The masters, in receipting for the coal, stated that they received it in good order and condition. If there had been anything in the appearance of the coal indicating that it was unfit, the masters, who were the agents of the owners of the ships, were in duty bound to reject it. If, through negligence, this duty was not performed, the fault would be that of the owners, for which they could not hold the charterers responsible. No rule of law with which we are familiar made it the duty of the charterers personally to inspect the coal, and, if they had made such an inspection, it would not have disclosed any patent defects. There was nothing the matter with the coal. It was all of the bituminous variety, and any bituminous coal is liable, under certain unfavorable conditions, to spontaneous combustion.

It is equally clear to us that there is no sufficient testimony in the record which shows that the method of loading the coal on the vessels was improper; and there is absolutely no evidence whatever that

the ships were not loaded in accordance with the regular method. The libels do not allege that any improper methods of loading were adopted. The only testimony suggesting that a different method might have been adopted came from one of the experts called by the libelants, and his testimony was purely speculative. He was not engaged in the shipping business, but was the head of a fuel engineering company. He thought it dangerous to take coal on board in hot weather; but there is no testimony showing that great steamships suspend loading in hot weather. He suggested that the coal being loaded on ships from barges ought to be protected from the sun by tarpaulins; but there is no testimony that such a method has ever been adopted. His testimony was not convincing. Even if a case of improper loading had been made out, it would only prove that the masters were negligent in permitting the coal to be so loaded, and the owners of the ship would be responsible, as the negligence of their agents, the masters, would be imputable to them, and they would not be entitled to recover. In Olsen v. United States Shipping Co., 213 Fed. 18, 129 C. C. A. 607, the owner of a vessel sought to recover damages from the charterer because of improper loading. We held in that case that there could be no recovery, and that the matter of loading was under the absolute control of the master, and that it was his duty to see that the cargo was properly loaded, and that it was no excuse to him that the charterers insisted on loading in an improper manner.

[2] As neither the owners nor the charterers were at fault, either in respect to the coal or in the method by which it was loaded, the question must be determined when, under these circumstances, the lay days began to run. The answer to that question must be that they did not begin to run until the heated stiffening coal was removed, and until that had been done the ships were not "ready to load."

We do not overlook the clause in the charter party, already set forth in this opinion, which states that:

"In the event of berth for loading or discharging not being available, lay days to count from the time captain gives notice of readiness to proceed to loading or discharging berth, vessel being duly entered and all other customs formalities complied with."

And we are aware that a number of days, a considerable period, before the surveyors recommended the discharge of the stiffening coal, all of the vessels had given notice that they were ready "to proceed to loading berth." But the fact is that they were *not* ready. A notice of readiness when a vessel is not actually ready has no effect. A notice is without legal effect, if the facts it states are untrue. A false notice must be treated as no notice. See Addicks v. 364 Tons Kainit (D. C.) 23 Fed. 727, 730; The St. Bernard (D. C.) 105 Fed. 994.

We do not regard W. & C. T. Jones S. S. Co. v. Barnes-Ames Co., 244 Fed. 116, 156 C. C. A. 544, as laying down a contrary principle. In that case the charterers had an option to cancel the charter party, if the vessel was not ready to receive cargo on a date specified, and the charter expressly provided what should constitute proof of readiness. That proof of readiness was introduced. In disregard of that

proof, the charterers canceled, and sought to show unreadiness by other proof. The court held this could not be done, and said:

" * * * The proof which the parties agreed upon had been furnished by the plaintiff, and the respondent was concluded thereby, in the absence of any allegation of fraud, and no such allegation has been made."

The case is easily distinguishable from the Addicks Case, supra, and from the St. Bernard Case, supra. The vessels could not be ready "to proceed to loading berth," unless on their arrival there they would be actually ready to load. The words can have no other meaning. The vessels must in fact be ready to load, and these vessels did not in fact become ready until the heated coal had been removed and other stiffening had been put in its place. Until that took place the vessels were not ready to receive on board for their voyage the cargoes of coal they had undertaken to carry. We think it quite clear, therefore, that inasmuch as the charterers are not responsible for the fact that the coal heated, the lay days did not commence to run until the heated coal was removed, and the vessels were ready to proceed to their loading berths. The obligation to load and discharge at the rate of 250 tons a day was not absolute, but conditional. It did not arise until the vessels were ready to receive cargo. The delay caused by the heating of the coal is not like delay caused by the decay of fruit cargo, or by the stowage of cargo stowed under other cargo. Such cases, therefore, as Porteous v. Watney, L. R. 3 Q. B. D. 34, 4 Asp. M. C. 434, Straker v. Kidd, L. R. 3 Q. B. D. 223, 4 Asp. M. C. 34n, and Leer v. Yates, 3 Taunt. 387, are inapplicable. In the cases now before us for decision, the coal endangered the ships themselves, and made them not ready to load.

[3] There is another reason why it seems to us that the charterers cannot in these cases be held liable for demurrage. The charters required them to pay demurrage for each day of detention by their own "default." If the delay in loading was not due to any default by the charterers or their agents, but was caused by a direct and immediate vis major, or by some unusual and extraordinary interruption, that could not have been anticipated when the contract was made, and which did not occur through the connivance or default of the charterers, the delay should not be attributed to their "default," and they were properly held not liable to pay demurrage. In our opinion the heating of the coal was such an extraordinary and unusual occurrence that it could not have been anticipated when the charters were made, and should not be regarded as a "default" within the terms of the charters. See Crossman v. Burrill, 179 U. S. 100, 110–114, 21 Sup. Ct. 38, 45 L. Ed. 106.

[4] This brings us to consider whether the circumstances are such as to make the loss sustained one of general average. All losses in a maritime adventure falling outside the contractual obligations of the parties, and which arise from a voluntary sacrifice of a part of the cargo, made to save the whole adventure from perishing, or which arise out of extraordinary expenses or expenditures of money incurred for the joint benefit of both ship and cargo, constitute a claim to general average contribution. The doctrine is founded on the principle

that what is sacrificed for the benefit of all should be made good by the contribution of all. It is one of the oldest and best established principles of the maritime law. See Columbian Insurance Co. v. Ashby, 13 Pet. 331, 10 L. Ed. 186; 3 Kent's Com. 233.

[5] The circumstances which the testimony discloses in the cases now before the court show: (1) A peril common to all the interests. (2) A peril which was imminent. (3) A voluntary, deliberate, and intentional act of sacrifice or expenditure, made to preserve all interests involved. (4) That the act of sacrifice or expenditure was necessary. (5) That the act was attended with success and the peril avoided. And where such circumstances concur the case is plainly one of general average. The coal, if it had been left in the vessels, was certain to be destroyed, and to injure, if not to destroy, the vessels. It was discharged, not simply to enable the voyage to be continued, but for the preservation of the coal itself, as well as of the vessels from a danger common to both.

As the necessity of discharging the heated coal and of replacing it with new stiffening is admitted by all concerned, there can be no doubt but the peril was both real and imminent. By imminent danger is meant only real or substantial danger. In Lowndes on General Average, 43, it is said that the word "imminent" apparently means—

"no more than 'real' or 'substantial,' for there is no reason to suppose it was intended to discourage the judicious making of a timely sacrifice to avert a danger approaching in the future."

And in Carver on Carriage by Sea, § 368, it is said:

"* * * The danger must be imminent, though it need not be actually pressing at the moment, or such that there is no chance of relief from it. If a peril threatens, which must destroy ship and cargo unless some relief which cannot be calculated upon intervenes, the master may make a sacrifice to avoid it which will amount to a general average sacrifice."

It is not necessary that the fire should have actually broken out. It is sufficient that the condition of things was such that there was an actual existing state of peril of fire, and not merely a fear of fire. The danger was present that, if nothing were done, spontaneous combustion and fire were sure to follow in natural course. Knight of St. Michael, L. R. (1898) Prob. Div. 30; The Brewster (D. C.) 95 Fed. 1000. If fire had actually followed from the spontaneous heating of cargo, there can be no doubt that the case would have been one of general average. Greenshields v. Stephens, [1908] A. C. 431; The William J. Quillan, 180 Fed. 681, 103 C. C. A. 647.

Moreover, the charter in the cases now before the court expressly provided that general average should be payable according to the York-Antwerp Rules, 1890. These rules expressly provide as follows:

"Rule 10b. The cost of discharging cargo from a ship, whether at a port or place of loading, call, or refuge, shall be admitted as general average, when the discharge was necessary for the common safety, or to enable damage to the ship caused by sacrifice or accident during the voyage to be repaired, if the repairs were necessary for the safe prosecution of the voyage." Congden on General Average, 171.

This brings us to inquire, in conclusion, whether the circumstances disclosed justified the respondents in impleading, under the fifty-ninth rule in admiralty (29 Sup. Ct. xlvi), which was then in force, the sellers of the coal which it was found necessary to unload because of the heating. That rule, or the material part of it, reads as follows:

"In a suit for damage by collision, if the claimant of any vessel proceeded against, or any respondent proceeded against in personam, shall, by petition, on oath, presented before or at the time of answering the libel, or within such further time as the court may allow and containing suitable allegations showing fault or negligence in any other vessels contributing to the same collision, and the particulars thereof, and that such other vessel or any other party ought to be proceeded against in the same suit for such damage, pray that process be issued against such vessel or party to that end, such process may be issued, and, if duly served, such suit shall proceed as if such vessel or party had been originally proceeded against; the other parties in the suit shall answer the petition; the claimant of such vessel or such new party shall answer the libel; and such further proceedings shall be had and decree rendered by the court in the suit as to law and justice shall appertain. * * *"

The fifty-ninth rule was promulgated on March 26, 1883. It was intended to prevent the injustice of leaving to the caprice of the libelant which of two colliding vessels he should hold, and its adoption followed shortly after the decision of Judge Addison Brown in The Hudson (D. C.) 15 Fed. 162, in which he very learnedly discussed the advantages of the procedure, and held that, even in the absence of such a rule, it was competent in a collision case for the District Court to allow the respondent to implead another vessel to answer for its share of the damages.

After the adoption of the fifty-ninth rule, the principle it announced was occasionally applied by analogy in cases to which it was not literally applicable. This seems to have been done upon the theory that the statutes and the admiralty court rules in cases not expressly provided for authorized the court "to regulate its practice as is fit and necessary for the advancement of justice." See The Alert (D. C.) 40 Fed. 836, and cases there cited. This appears to afford an explanation of the change of language in the new fifty-sixth rule, which takes the place of the old fifty-ninth rule, and was promulgated on December 6, 1920, and which became of force on and after March 7, 1921. 254 U. S. 707, 40 Sup. Ct. xxi. The relevant part of rule 56 reads as follows:

"In any suit, whether in rem or in personam, the claimant or respondent (as the case may be) shall be entitled to bring in any other vessel or person (individual or corporation) who may be partly or wholly liable either to the libelant or to such claimant or respondent by way of remedy over, contribution or otherwise, growing out of the same matter. * * *"

[6] The intention of the fifty-sixth rule is to allow the respondent to bring in a party jointly liable for the wrong complained of in any case which is within the admiralty jurisdiction, whether the case is one of collision or not. But it certainly could not have been intended to enlarge the admiralty jurisdiction by permitting a party to be impleaded in a matter respecting which it would otherwise have no jurisdiction.

[7] While the admiralty jurisdiction extends to all maritime contracts, it does not take cognizance of agreements not in themselves maritime. The principle is elementary, and is stated in Benedict's Admiralty, § 143. And it is there laid down that:

"Where the principal subject-matter of a contract belongs to the jurisdiction of a court of common law or of equity, the whole contract belongs there, and admiralty will not take jurisdiction, even though incidental matters connected with the contract might in themselves be cognizable in the admiralty."

In The Ada, 250 Fed. 194, 162 C. C. A. 330, this court had before it a libel filed against the steamer in rem and against the owner in personam to recover damages for the breach of the charter and for breach of the contract of sale. The District Court had held that the damages for breach of contract were not recoverable in admiralty. This court affirmed the judgment, and said that a contract enforceable in admiralty must be wholly maritime. It is true that in The Ada the fifty-ninth rule was not directly involved.

In Central Leather Co. v. The Goyaz, 281 Fed. 259, recently decided in the District Court for the Southern District of New York, the Ada Case was followed and the doctrine reiterated. In the Central Leather Company Case the fifty-ninth rule was directly involved. The suit was brought against the steamship to recover damages for injuries to hides shipped at Rio Grande do Sul, Brazil, to New York. The damages were caused by the contact of the hides with sea water alleged to be due to the unseaworthiness of the steamer. The claimant sought to petition under the fifty-ninth rule the shippers of the hides who were also the charterers of the steamer. The right to do so was denied, the court stating that:

"There could be no other liability upon their part, except for shipping bad hides, which is no concern of the claimant, and a contract of sale not being maritime, the court had no jurisdiction whatever of the subject-matter. The holders of the bills of lading could only recover damages of Thomsen & Co., the sellers, in an action at law."

[8] The power given to the Supreme Court to enact rules regulating the District and Circuit Courts was given by the Act of Congress of August 23, 1842, 5 Stat. 518. Section 6 of that act reads as follows:

"And be it further enacted, that the Supreme Court shall have full power and authority, from time to time, to prescribe, and regulate, and alter, the forms of writs and other processes to be used and issued in the District and Circuit Courts of the United States and the forms and modes of framing and filing libels, bills, answers, and other proceedings and pleadings, in suits at common law, or in admiralty and in equity pending in the said courts, and also the forms and modes of taking and obtaining evidence and of obtaining discovery, and generally the forms and modes of proceeding to obtain relief, and the forms and modes of drawing up, entering, and enrolling decrees, and the forms and modes of proceeding before trustees appointed by the court, and generally to regulate the whole practice of the said courts, so as to prevent delays, and to promote brevity and succinctness in all pleadings and proceedings therein, and to abolish all unnecessary costs and expenses in any suit therein."

The above provision could confer no authority upon the court to enact substantive law. It simply gave to the court the right to regu-

late matters of practice. And the order of the Supreme Court by which the rules were promulgated refers to them as "the rules of practice for the courts of admiralty." Now a cause of action which is within the sole jurisdiction of a court of common law cannot be converted into one within the jurisdiction of a court of equity or of a court of admiralty by a mere rule of practice, for it works a change in the substantive law. And if a common-law cause of action can be converted into an equitable one by a rule of practice, why cannot an equitable one be converted into one at common law? Of course, there would be constitutional objection, and there are constitutional objections which stand in the way of bringing a common-law action into the admiralty court through the fifty-ninth or the fifty-sixth rule.

[9] In the cases now before the court the contracts made by the charterers with the coal dealers were not contracts of affreightment, but contracts of sale. The coal purchased was not bought to supply fuel to be used in aid of the navigation of the ships, but as cargo to be carried to South America. The stiffening cargo was cargo, just as much as the rest of the coal was. As contracts of sale, jurisdiction over them belonged to the courts of common law, and the sellers of the coal have a constitutional right to have any claim made against them for breach of warranty tried by a jury.

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

We have thought it advisable to express our opinion thus fully on the subject of the fifty-ninth rule. Not only did the several respondents implead under that rule the sellers of the coal, but the court below explicitly dismissed the bill as to them upon the specific ground that they could not be impleaded under the rule in question, inasmuch as the cause of action as between the respondents and the parties impleaded, if one existed, arose out of a nonmaritime contract. The question was argued fully before us, and counsel insisted that the impleader was proper. The subject having been thus squarely presented, we have given the matter careful consideration, not only because of its importance, but because certain decisions in the District Court for the Southern District of New York have been regarded as indicative of a conflict of opinion on the subject in this circuit. Evans v. New York & Pacific S. S. Co. (D. C.) 163 Fed. 405, and Hewlett v. New York & Cuba Mail Steamship Co., decided on April 7, 1916, but not reported, both of which cases were decided by Judge Hough, have been cited as presenting one view of the subject. The opinion of Judge Ward in this case in the court below, and his opinion in Central Leather Co. v. Steamship Goyaz, supra, and his opinion in this court in The Ada, 250 Fed. 194, 162 C. C. A. 330, present the other view. The majority of this court are convinced that, as the claim of the charterers, if one exists against the sellers of the coal, is nonmaritime, there was no right to implead them under the fifty-ninth rule.

Decree affirmed.

HOUGH, Circuit Judge (concurring). I fully concur in the reasoning and conclusion of ROGERS, J., as to the propriety of dismissing all the libels, and enforcing a general average. Since, however, the charterers were properly exonerated, the liability of the coal vendors to said charterers disappears. But it was only to respond for such liability as might be established against the charterers that the vendors were cited into the suits. As no such liability exists, the discussion of rules 59 and 56 becomes obiter, and I express no opinion thereon. It may be noted that the final decrees, from which appeals were taken, do not suggest any legal proposition requiring, or even justifying, the discussion.